THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. TIMOTHY C. CHATMON, Defendant-Appellant.

Second District   No. 2—90—1426

Opinion filed November 17, 1992.—Rehearing denied December 18, 1992.

McLAREN, J., dissenting.

G. Joseph Weller and Steven E. Wiltgen, both of State Appellate Defender's Office, of Elgin, and Michael J. Pelletier and Debra R. Salinger, both of State Appellate Defender's Office, of Chicago, for appellant.

Paul A. Logli, State's Attorney, of Rockford (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

A jury found defendant, Timothy Chatmon, guilty of first-degree murder pursuant to section 9—1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). He was sentenced to 35 years' imprisonment. He raises the following issues on appeal: (1) whether his motion to suppress evidence obtained during a traffic stop was improperly denied; (2) whether the State's key witness' testimony was so fraught with inconsistencies that it raises a reasonable doubt of defendant's guilt; (3) whether the State improperly called a witness solely to impeach her; (4) whether the trial court erred in excluding portions of a doctor's evidence deposition that impeached the credibility of the State's key witness; (5) whether the trial court erred in refusing to rule on or grant his motion for a new trial; and (6) whether his sentence is excessive. We affirm.

On September 8, 1989, a body, later identified as Billy Joe Simmons (the victim), was discovered in a cornfield outside of Rockford, Illinois. Defendant, Frederick (Ricky) Lambert and Clementhis Lambert were charged with first-degree murder. Defendant's trial was severed from the trials of his codefendants and commenced on January 24, 1990.

The State's key witness was Lori Mullins, a prostitute whose pimp was Clementhis Lambert. Mullins testified after receiving immunity from prosecution. Mullins identified defendant and stated that on August 6, 1989, at approximately 11:30 p.m., she, Clementhis and defendant drove to the Champion Park apartments on Chestnut Court, where the victim's girlfriend lived. Ricky Lambert also arrived in a separate vehicle. They drove there so Clementhis could talk with the victim. Ricky walked toward the apartment while Clementhis and defendant stood between two apartment buildings. The victim came out of the home and spoke with Ricky. Ricky told the victim that he wanted to talk to him between the buildings.

Mullins further stated that an argument ensued. Clementhis pulled out a gun and shot the victim, who fell to the ground. Ricky also fired a shot that hit the victim. Defendant leaned over the victim and shot him once. At the time of the shooting on Chestnut Court, Mullins recalled seeing Louis Leavy and Odell Simmons. She did not remember seeing them after the shots were fired.

Clementhis, Ricky and defendant placed the victim's body in the front passenger seat of Ricky's car. Defendant sat in the backseat. Mullins and Clementhis led the way in Clementhis' car. Mullins stated that the victim was taken to the outskirts of Rockford on Cook Road. Mullins was familiar with this road because she had taken her clients there for seclusion. Earlier that day, Mullins had mentioned to Clementhis that Cook Road was isolated, and the two of them drove out to view the area.

When the group arrived, Clementhis walked toward Ricky's car. Clementhis opened the passenger side door, pulled out a gun and fired a shot at the victim. Clementhis then sat in the backseat behind the driver, Ricky, and fired another shot at the victim. Defendant was still seated in the backseat directly behind the victim.

The victim's body was then placed in the cornfield adjacent to the roadway. Mullins recalled seeing Clementhis and Ricky "fumbling around" the victim's neck and fingers. Clementhis returned to the car with chains in his hands.

Ricky and defendant left the scene in Ricky's car. Mullins and Clementhis drove to Ricky's girlfriend's home. Ricky arrived without defendant and gave his girlfriend a chain with a ring around it. Mullins, Clementhis and Ricky drove to a car wash to clean Ricky's car. They then drove to Springfield; Mullins and Clementhis were in Clementhis' car, and Ricky drove his own vehicle. Mullins further testified that she used the name Susan Smith in Springfield. She then identified her Springfield motel registration of August 7, 1989. She testified that they registered at approximately 4 a.m.

On cross-examination, Mullins was impeached with the two prior statements given to the police and her grand jury testimony. In Mullins' first statement to the police, Mullins claimed that, before the shooting on Chestnut Court, Clementhis and the victim had an argument in which guns were drawn. She claimed that Clementhis killed the victim and dumped the body in a field while she was at Clementhis' sister's house. Clementhis then admitted killing the victim while he and Mullins were driving to Springfield.

In Mullins' second statement to the police, she described a shootout between Clementhis and the victim at "The Taste of Honey," a

bar in Rockford. She claimed that the shoot-out occurred because the victim owed Clementhis money for drugs. The shoot-out occurred at approximately 3 p.m., but, on cross-examination, Mullins stated that it occurred at 11 a.m. Defendant was also involved in the shoot-out. Mullins stated that no one was hurt and the victim left the area. However, at trial, Mullins claimed that Clementhis gave the victim a ride to his mother's home after the shoot-out.

Also, in Mullins' second statement to the police, she stated that, after the victim was shot at the Champion Park apartments, the victim's body was left there while Mullins, Clementhis and Ricky Lambert, and defendant drove away. They all drove to Ricky's girlfriend's home. The time was approximately 8 or 9 p.m. Mullins told the police that they all returned to Chestnut Court, wrapped the victim's body in a blanket, and put the victim in Ricky's trunk. When they arrived at the cornfield, the victim was not shot again, but his body was carried into a field. While returning to Rockford, Ricky pulled off the road and threw out the blanket in which the victim's body was wrapped. She claimed that they returned to Ricky's girlfriend's home at 3 or 4 a.m. At trial, Mullins viewed a drapery found near the crime scene and stated that the police had never shown her the drapery before. She also acknowledged that the police stated she could be charged as an accessory to murder if she did not cooperate with them.

When Mullins testified before the grand jury, she also stated that Clementhis gave the victim a ride to his mother's home after their shoot-out at "The Taste of Honey." However, she described the disposal of the victim's body differently. She claimed that, when the group arrived at the cornfield on Cook Road, Clementhis shot at the victim from the passenger side door. She did not state that Clementhis fired a second shot while sitting behind the driver's seat. On cross-examination, Mullins acknowledged that, before her grand jury testimony, the State's Attorney told her that no blood was found in Ricky's trunk so her previous statement to the police could not be true.

Mullins also testified on cross-examination that she spoke with a private investigator, William Morrison, about the incident. She told him that Ricky and Clementhis did the shooting on Chestnut Court. She did not tell him that defendant also shot the victim, but stated that he was present.

The State's other main witness was Louis Leavy, the victim's cousin. He testified that he grew up with defendant, the victim and the Lambert brothers. On August 6, 1989, at midnight, defendant,

Clementhis and Ricky were outside the apartment complex. Everyone was talking and getting high on drugs. Leavy denied hearing anything unusual at that time. Leavy acknowledged signing the statement in which he stated that, around midnight on August 6, 1989, he heard Clementhis, Ricky, defendant and the victim talking on Chestnut Court. He claimed that Clementhis, Ricky and defendant had their guns drawn. He heard shots and hid behind a garbage stall. When the shooting stopped, Leavy saw Clementhis and Mullins leave in Clementhis' car. Defendant and Ricky left in another car. Leavy then heard someone say that the victim had been shot. On cross-examination, Leavy claimed that he got his days mixed up in his previous statement because he was high and drunk.

The victim's mother testified that her son wore rings on each finger and a diamond engagement ring on a chain around his neck. She then identified the engagement ring as the one taken from Ricky's girlfriend.

Roshell Woods was at his girlfriend's apartment on Chestnut Court on the night of August 6, 1989. Around midnight, Woods heard three or four people cursing at one another. This was followed by three or four gunshots. A few minutes after the gunshots, Woods looked out the window and saw what he believed was one light-colored and one dark-colored Cadillac leave the area. On cross-examination, Woods acknowledged that he may have heard the shots between 1 and 2 a.m.

Stacy Lovings, a resident of the Champion Park apartments, testified that she had previously spoken with a police officer about the victim's murder. She did not recall telling Officer Mark Fritz that she saw Clementhis, Ricky, defendant and the victim arguing on August 6, that she heard gunshots and saw Clementhis, Ricky and defendant drive away in two Cadillacs, and that she saw blood leading from the spot of the argument to the parking lot. Officer Fritz then testified about his interview with Lovings. He stated that, at the time of the interview, Lovings knew defendant.

The victim's girlfriend, Patti Tennial, identified the ring at trial as the one the victim gave her as the engagement ring that she returned to him. However, this identification conflicted with a previous statement she gave to a private investigator in which she said the diamond ring had a white gold setting. The victim's girlfriend further testified that she saw the ring after the victim's death on Ricky Lambert's girlfriend's finger. She also identified the gun found during a traffic stop involving defendant as the victim's gun. She stated that the gun was in the victim's possession two days before he disappeared.

The victim's girlfriend further testified that defendant and the victim were good friends. Defendant would stay over at her home with the victim. She did not see defendant and the victim argue before the victim's death. On August 6, 1989, she last saw the victim between 9:30 and 10 p.m. She did not hear any shooting that night. She also testified that Ricky Lambert did not come to her door to get the victim on that evening. However, she testified that she went to sleep between 9:30 and 10 p.m. and slept until morning. The victim's girlfriend stated that defendant came to her home looking for the victim two days after the murder allegedly took place.

Officer David Jocson, who made a traffic stop involving defendant on August 14, 1989, identified the gun at trial as the one he seized during his search of the vehicle. Jocson testified that, when he asked defendant about the gun, defendant denied ever seeing it before.

Officer Fritz, a special agent with the Illinois State Police, testified that he interviewed Ricky Lambert's girlfriend and recovered from her a gold-banded, diamond ring. He later interviewed Louis Leavy. Fritz testified that Leavy was able to communicate with Fritz. Fritz did not detect any unusual odor emanating from Leavy. Fritz then identified Leavy's statement, Leavy's signature and his own signature. Fritz also testified that Leavy told him, after Leavy had given his statement claiming that he did not see the victim's shooting, that he did see the shooting. Fritz did not take another statement, but put that information in his report.

Richard Cass, a crime technician with the Illinois State Police, testified that he examined the scene where the victim's body was found and collected some bluish-tinted glass. Cass also recovered glass from the floor and molding in the right front passenger door of Ricky's silver Cadillac, as well as carpet samples, molding and an armrest. Cass testified that Ricky's Cadillac had no broken windows. Cass found no bullet holes in the vehicle. Cass found no evidence that the interior of the vehicle had been cleaned recently. However, Cass found what he believed were bone-like fragments inside the right rear floorboard. Cass testified that none of the glass had bloodstains on it.

Cynthia Barrera, a forensic scientist, testified that she tested stains taken from Ricky's vehicle. She tested the molding, armrest, carpet and metal from Ricky's vehicle and found that some items had human bloodstains on them. Barrera further testified that she had no way to determine whose blood was on the items. Barrera stated that the stains did not look like they had been wiped, although some of the stains were small specks. One stain on a piece of metal trim was 4½ inches long and one-quarter inch wide. A sweatshirt found near the

victim's body also had bloodstains on it. The sweatshirt had many holes, but Barrera could not say that they were bullet holes.

Dr. Larry Blum, a forensic pathologist, testified that the victim's body had an entrance bullet wound in the back left side of his head and an exit bullet wound in the right front side of his head. Powder particles around the wound demonstrate that the victim was shot at close range. Because the body was significantly decomposed, Dr. Blum could not determine whether there were bullet wounds in the body. If the victim was shot in the chest, there was a 50% chance that the bullet would hit bones in the chest area. Dr. Blum found no bone damage in the chest area. However, 40 small pellets were discovered in the lower extremities.

James Erceli, a forensic scientist, compared glass recovered from the cornfield and glass recovered from Ricky's car. Although both samples of glass had similar characteristics and were probably of common origin, Erceli could not conclude that they originated from the same place. Each was tempered glass that could come from an automobile window, the doors or windows of a business, or possibly a shower door.

Officer Michael Easton testified that an automobile trip from Rockford to Springfield would take two hours and 45 minutes, travelling 5 to 10 miles an hour over the speed limit. Also, one can travel from the Champion Park apartments to Cook Road and Wygert Road in 14 minutes.

After defendant's motion for a directed verdict was denied, he presented his case. Derek Cross, the manager of the car wash where Ricky's car was allegedly taken to be cleaned, testified that the car wash closed at 10 p.m. However, the sprayers and vacuums could be used. The lights in the stalls were turned off automatically at 10 p.m. The floodlights in the lot remained lit.

Gerald Stewart, the night auditor at Red Roof Inn in Springfield, testified that he registered a Susan Smith at 3:46 a.m. on August 7, 1989. The registration slip reflected a check in time of 4 a.m.

Moneek Simmons, the victim's sister, testified that she saw the victim, Clementhis, Ricky, Mullins and defendant outside her apartment on Chestnut Court at midnight the night of August 6, 1989. They talked for 20 or 30 minutes before she left. She stated that the victim and defendant were good friends. She also stated that she never saw the victim again after that night.

Walter Simmons, the victim's cousin, testified that he was with defendant and Clementhis drinking beer and listening to music on Chestnut Court from 11 p.m. until 4 a.m. Walter also recalled seeing

the deceased during that time walking to Patti Tennial's apartment. Walter recalled no gunshots that night. Walter last saw defendant at 11:30 p.m. that evening.

Maxine Russell, the victim's sister, testified that a week after the shooting, Clementhis and Mullins were having an argument at her home. Maxine heard Mullins say that, if Mullins could not have Clementhis, nobody could have him. Maxine discovered that Clementhis was leaving Mullins.

Dr. Frederick McNelly, a clinical psychologist, testified that Mullins told him that she had taken cocaine in the past but not the previous two years.

William Morrison, a private investigator, testified that he interviewed Lori Mullins from a Billings, Montana, jail in December 1989. Mullins told him that, in exchange for her testimony in this case, she was promised help with pending criminal charges in Winnebago and Effingham Counties.

Officer Fritz was again called to testify and stated that he interviewed Roshell Woods about the murder. Woods could not recall whether he heard the argument outside his girlfriend's apartment on a weekday or weekend. Woods stated that it was between 1 and 2 a.m. Woods could not describe the type of cars he saw driving away. Fritz also testified that, when he interviewed Mullins on September 19, 1989, she told Fritz that she arrived in Springfield at 7 a.m. on August 7, 1989.

William Burrell, the owner of "The Taste of Honey," testified that, on August 6, 1989, at approximately 11 p.m., bullets were fired into the bar. Burrell recognized the victim as one of the people doing the shooting. Burrell did not allow the victim in his bar because of an incident that occurred at another bar owned by Burrell.

Faye Cole, defendant's girlfriend, testified that, on August 6, 1989, around 10 p.m., she, defendant and the victim were at "The Taste of Honey." Cole stated that a shooting occurred involving the victim. After the shooting, defendant gave the victim a ride to Chestnut Court. While there, Cole saw the victim give defendant a gun. They remained on Chestnut Court drinking beer until 2:30 a.m. Clementhis and Mullins had already left. The victim was still there. Defendant slept on Cole's couch that evening. Cole identified the gun seized by the police as the gun the victim gave defendant that night.

Officer Easton testified that, after Mullins gave her second statement to police, they used a helicopter to attempt to locate the bloody blanket. Drapes were found that were not analyzed. Easton acknowledged that Mullins changed her story about the victim's body being

placed in the trunk after she was told that no blood was found in the trunk. Mullins was not told that bloodstains were found inside the car.

Jessie Leach testified that he knew the victim but they were not friends. Leach acknowledged that he had a confrontation with the victim in July or August 1989. Leach was not allowed to testify concerning the confrontation.

Defendant took the stand and testified that, on August 6, 1989, at approximately 10 p.m., he was at "The Taste of Honey." The victim asked defendant for the gun the victim had given him about a month earlier. The victim fired shots at the bar. Defendant gave the victim a ride and put the gun in his trunk. They drove to the Champion Park apartments after getting some bootlegged beer. Clementhis and Mullins followed in another car. He, the victim, Clementhis, Leavy, and others "hung out" on Chestnut Court. Clementhis and Mullins left after 15 minutes to go to Springfield. When defendant and Cole left the area about 2 a.m., the victim was still there. Defendant took the gun from the trunk and brought it into Cole's home. Defendant slept through the evening. At noon the next day, defendant went to the Champion Park apartments for a scheduled meeting with the victim. The victim never arrived.

Defendant further testified that, on August 14, 1989, he was stopped by the Illinois State Police while driving to Springfield. Defendant identified the gun seized during the traffic stop as the gun given to him by the victim. Defendant acknowledged lying to Officer Jocson when defendant said it was not his gun. Defendant denied ownership of the gun because it was illegal. Defendant denied shooting the victim. On cross-examination, defendant admitted that he did not tell the police that the victim was wearing a sweatshirt that night.

In rebuttal, Officer Fritz testified that defendant told Fritz he drove a 1976 Granada. Fritz also stated that defendant told him the victim was wearing a T-shirt, not a sweatshirt, that evening. Ron White, assistant State's Attorney for Winnebago County, testified that he made no promises to Lori Mullins concerning her pending cases in Winnebago and Effingham Counties.

The jury found defendant guilty of first-degree murder. Defendant filed *pro se* motions for the arrest of judgment and a new trial. After counsel was appointed, another motion for a new trial was filed. The affidavit of Latanya Latin was attached to the motion. She claimed that Jessie Leach threatened to kill the victim. After the victim's disappearance, Leach told Latin that he did not have to worry about the

victim anymore. Defendant's motion was denied. Defendant was sentenced to 35 years' imprisonment.

Thereafter, defendant filed a motion to reconsider the denial of his motion for a new trial based on newly discovered evidence. Defendant argued that, during Clementhis Lambert's trial, Lori Mullins testified that she did not see or hear defendant shoot the victim. Defendant's motion to reconsider was denied. He then filed a timely appeal.

### MOTION TO SUPPRESS

At issue is whether the trial court erred in denying defendant's motion to suppress the gun recovered during the August 14, 1989, traffic stop.

Before trial, defendant moved to suppress evidence the police discovered during a traffic stop. At the suppression hearing, Officer Jocson testified that, on August 14, 1989, at approximately 10 p.m., he was working on Route I-55 in McLean County when he made a stop. Two vehicles had pulled onto the shoulder, a white Escort and a blue Nova. Both occupants of the Escort exited the car, and the driver urinated on the shoulder of the highway. Jocson activated his spotlight and emergency lights and approached the vehicle. Jocson believed they were violating section 11—1303 of the Illinois Vehicle Code (Ill. Rev. Stat. 1987, ch. 95½, par. 11—1303).

Jocson called in the Escort registration. The vehicle was registered to Clementhis Lambert. Jocson walked up to the passenger side of the vehicle and saw two black males sitting in the car. Jocson asked to see each of their driver's licenses. The passenger was defendant, and the driver, who did not produce a driver's license, identified himself as Jessie Allen.

While speaking to the men, Jocson observed in plain view a partially burned cannabis cigarette. Jocson also smelled the odor of cannabis. Jocson ordered the men out of the car, searched the interior of the car, and found two plastic packets, one containing cannabis and another containing cocaine. Defendant and Allen were arrested. Another search revealed a .38 caliber handgun.

Clementhis Lambert was one of the two people in the blue Nova. Clementhis was subsequently arrested by another officer at the scene for an outstanding warrant. After all the evidence was presented at the hearing, the trial judge ruled as follows:

"I think that the statute forbids stopping or standing on such a highway, and if such stopping or standing occurs then I think the burden is on the person who stops to establish that the stop

is a valid emergency stop which should not be punished by being considered to be a violation of the law.

I think the officer had a right to approach this vehicle to determine why the stop occurred."

Thus, the trial court denied defendant's motion to suppress.

Defendant contends that the officer had no basis to make an investigatory traffic stop. He argues that the vehicle was legally parked on the shoulder of Route I-55, a controlled-access highway. Defendant claims that the definition of "roadway" in the Illinois Vehicle Code (Ill. Rev. Stat. 1989, ch. 95½, par. 1—179) excludes the shoulder. Thus, defendant contends that he was not stopped on the highway because he was off the highway, on the shoulder. Defendant alternatively contends that, even if stopping is allowed on a controlled-access highway only for emergencies, the driver's need to urinate was an emergency.

The State contends that the officer did not make an investigatory stop, but approached the stopped vehicle because a violation of the Illinois Vehicle Code was being committed: parking where prohibited. The State argues that the shoulder is considered part of the highway, citing *Amster Corp. v. Aurora Fast Freight* (1986), 141 Ill. App. 3d 705, so the "shoulder" of a controlled-access highway is not a shoulder on which vehicles may lawfully stop. The State also argues that the driver's need to urinate was not an emergency. The State alternatively contends that, even if the trial court erred in admitting the evidence from an illegal stop, the error was harmless because the gun was not crucial evidence in the case.

A trial court's decision on a motion to suppress will not be overturned on review unless that decision was clearly erroneous. (*People v. Galvin* (1989), 127 Ill. 2d 153, 162; *People v. Simmons* (1991), 210 Ill. App. 3d 692, 696.) The defendant has the burden to make a *prima facie* showing that the police illegally obtained the evidence. (*Simmons*, 210 Ill. App. 3d at 696.) Once this burden is satisfied, the burden of proof shifts to the State to show that the search was legal. *Simmons*, 210 Ill. App. 3d at 696.

■ Although both parties wish to debate whether defendant violated section 11—1303(a)(1)(j) of the Illinois Vehicle Code, such a determination need not be made for purposes of determining whether the gun seized from defendant must be suppressed. The key question is whether Officer Jocson had a reasonable, articulable suspicion of criminal activity such that he could approach the vehicle. (See *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868; *People v. Murray* (1990), 137 Ill. 2d 382, 387.) Here, Officer Jocson testified

that he approached the vehicle because he believed the driver was violating section 11—1303 of the Illinois Vehicle Code. Generally, section 11—1303(a)(1)(j) prohibits stopping, standing or parking on any controlled-access highway except under certain circumstances. We believe the officer was within constitutional bounds when he approached the vehicle to determine the reason why the vehicle was parked. Then, as suggested by the trial judge, the occupants of the vehicle have the burden to establish that the stop was permissible under the exceptions to section 11—1303.

Officer Joscon's actions after approaching the vehicle were also within constitutional bounds. As Jocson was speaking to the occupants, he observed in plain view a partially burned cannabis cigarette. The officer's detection of marijuana then gave him probable cause to search the vehicle. (See *People v. Graves* (1990), 196 Ill. App. 3d 273, 279.) A second search after defendant's lawful arrest revealed the handgun in question. We hold that the officer had a reasonable, articulable suspicion to approach the vehicle. Thus, his subsequent discovery of the handgun was lawful, and the handgun need not be suppressed.

Defendant's reliance on *People v. Reusch* (1991), 209 Ill. App. 3d 991, is misplaced. Although this court found that the investigatory traffic stop was improper where the driver pulled off the road to urinate (209 Ill. App. 3d at 993), the case is inapplicable because the stop occurred on a rural road. (*Reusch*, 209 Ill. App. 3d at 992.) Here, the stop occurred on a controlled-access highway, where stopping is prohibited under section 11—1303(a)(1)(j) of the Illinois Vehicle Code.

### REASONABLE DOUBT

Defendant contends that he was not found guilty beyond a reasonable doubt because the testimony of the State's main witness, Lori Mullins, contained major contradictions that raise serious doubts about her credibility. Mullins stated that a shoot-out took place between defendant, the victim and Clementhis before the murder on Chestnut Court, but she gave different accounts about when and where this took place. Mullins also gave contradictory versions of how the victim was transported to the cornfield where his body was found. Defendant argues that these inconsistencies, coupled with weak corroborating evidence, create a reasonable doubt of his guilt.

The State contends that defendant was proved guilty beyond a reasonable doubt. The State argues that the jury heard Mullins' inconsistencies and still found her to be a credible witness. The State also argues that Mullins' testimony was corroborated by the statements of Louis Leavy and Stacy Lovings as well as the glass found in Ricky

Lambert's car and found near the victim's body. Finally, the State argues that Mullins was steadfast in her testimony regarding the murder and defendant's participation in it.

On review, a criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt. (*People v. Burrows* (1992), 148 Ill. 2d 196, 224.) It is not this court's function to retry a defendant when considering a challenge to the sufficiency of the evidence. (*People v. Steidl* (1991), 142 Ill. 2d 204, 226.) The jury weighs the credibility of witnesses and resolves the conflicts or inconsistencies in their testimony. (*People v. Frieberg* (1992), 147 Ill. 2d 326, 360.) " '[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Frieberg*, 147 Ill. 2d at 360, quoting *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789.

■ With the principles above in mind, we find that defendant was found guilty beyond a reasonable doubt. This is not to say that Mullins' testimony and prior statements to police did not contain inconsistencies. However, these inconsistencies were resolved by the jury as fact finder, a task solely within its province. The jury was also aware that Mullins had received immunity from prosecution. Mullins' motive to lie was squarely before the jury, and it chose to believe her testimony.

Mullins' second statement to the police, her grand jury testimony, and her trial testimony consistently described a shoot-out between defendant, Clementhis and the victim prior to the murder. Mullins acknowledged at trial that her first statement to the police was a lie because she feared Clementhis. Mullins was unclear about what time of day the shoot-out occurred, stating at various times that it occurred at 11 a.m., 3 p.m., 8 p.m. and 11 p.m. Mullins explained that she was "mixed-up" about time periods. Although Mullins was confused about the time of day, she was consistent in testifying about the shoot-out and the people present.

Defendant also claims that Mullins gave inconsistent accounts about where and how many shots entered the victim's body. Mullins stated each time, excluding her first statement to the police, that the victim was shot in the body one time each by defendant, Ricky and Clementhis. At the grand jury hearing, Mullins testified that Clementhis shot the victim in the head while the victim was seated in Ricky's car on Cook Road. At trial, Mullins expounded on this testimony by

claiming that Clementhis shot the victim twice in the head in Ricky's car. We will not include yet another version of the shooting Mullins testified to at Clementhis' subsequent trial, because the jury did not hear it and it would not affect the reasonable doubt analysis. That testimony will be discussed later under the issue of a new trial.

Mullins' different versions of the number of shots fired and where the bullets entered do not create a reasonable doubt concerning defendant's participation in the murder. Defendant claims that Dr. Blum, the pathologist who conducted the autopsy, found no evidence that the victim was shot in the body. However, Dr. Blum also testified that the body was so decomposed that bullet holes were undiscoverable. Mullins consistently placed defendant at the scene of the murder with his gun drawn and aimed at the victim. Even if defendant had not fired the gun, his participation in the crime allowed the jury to find him guilty of first-degree murder as it was instructed on the accountability or accomplice theory.

Further, Mullins' conflicting versions of how the victim's body was disposed do not create a reasonable doubt concerning the method and participants in the crime. First, Mullins stated that the victim's body was wrapped in a blanket and driven to Cook Road in Ricky's trunk. Mullins later testified that the victim was placed in the passenger seat of Ricky's car and driven out to Cook Road. In both versions, defendant participated, and the victim's body was left in a cornfield on Cook Road. The record does not reflect that the police informed Mullins where the victim's body was discovered prior to her statements. Her knowledge of the area where the victim's body was found and the accuracy of her directions to the area demonstrate Mullins' grasp of the facts surrounding the victim's murder.

Defendant also argues that the corroborating evidence in the case was weak. We would agree that, without Mullins' testimony, the case against defendant would not be solid. However, the corroborating evidence does help to bolster Mullins' testimony, creating a stronger case against defendant.

The jury heard Louis Leavy's statement to the police in which he stated that he saw an argument between the victim, Clementhis, Ricky and defendant; he heard gunshots and heard someone say that the victim had been shot. Leavy's statement was admissible as substantive evidence pursuant to section 115–10.1 of the Code of Criminal Procedure of 1963 because the following criteria were met: (1) the prior statement was inconsistent with Leavy's trial testimony; (2) Leavy was subject to cross-examination; (3) the statement described an event of which Leavy had personal knowledge; and (4) Leavy ac-

knowledged under oath that he had made the statement. Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1; *People v. Posedel* (1991), 214 Ill. App. 3d 170, 176.

Similarly, Stacy Lovings gave a statement to the police in which she stated that she saw Clementhis, Ricky and defendant arguing with the victim; she heard shots, saw them drive away, and the next day saw blood in the parking lot. However, as we will discuss later, Lovings was improperly impeached with the above statement by the State. Thus, we will ignore her testimony in assessing whether reasonable doubt exists.

In addition to Mullins, Roshell Woods testified that he heard three or four people arguing outside the Champion Park apartments that evening, followed by gunshots. He saw two cars he believed were Cadillacs leave the area. Human blood was found in Ricky's car. Also, glass was found in Ricky's car that had the same characteristics as glass found near the victim's body. Taking all this evidence together and viewing it in the light most favorable to the prosecution, we hold that defendant was found guilty of first-degree murder beyond a reasonable doubt.

Defendant's reliance on *People v. Pellegrino* (1964), 30 Ill. 2d 331, is misplaced. There, as the State points out, one eyewitness was stunned from a beating and had changed her testimony, and the other eyewitness was suffering from the effects of an extended period of drunkenness. (*Pellegrino*, 30 Ill. 2d at 334-35.) Here, although Mullins testified inconsistently concerning portions of the evening, she did not have a physical impairment which would have affected her abilities to observe.

### IMPEACHMENT

At issue is whether Stacy Lovings was improperly impeached under Supreme Court Rule 238 (134 Ill. 2d R. 238), thus depriving defendant of a fair trial. Defendant contends that Lovings was called to the witness stand solely so she could be impeached with her prior statement to the police. Defendant claims that the State's case was not damaged by Lovings' initial trial testimony, so the State could not proceed to impeach her. Defendant also claims that the error was compounded when Lovings' out-of-court statement was admitted as substantive evidence.

The State contends that Supreme Court Rule 238 (134 Ill. 2d R. 238) applies to witnesses who are hostile, uncooperative or unwilling. The State claims that Lovings was both uncooperative and unwilling, so she could be examined as if under cross-examination. The State

also contends that the prior statement was not admitted as substantive evidence. Finally, the State argues that defendant failed to preserve this issue for review.

We will first address the issue of waiver. To preserve an issue for review, the defendant must object at trial and include the objection in a post-trial motion. (*Burrows*, 148 Ill. 2d at 229.) However, under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)), an issue may be reviewed as plain error if the evidence in the case is closely balanced or the error is so fundamental and of such magnitude that it denied the accused a fair trial. *People v. Herrett* (1990), 137 Ill. 2d 195, 209-10.

We find that defendant failed to preserve this issue for review. Defendant did not object to the impeachment of Lovings at trial, although he did include this issue in his post-trial motion. However, we will overlook the waiver and analyze the issue under plain error because we find the evidence in the case to be closely balanced.

Supreme Court Rule 238(a) states that parties may attack the credibility of their own witnesses. (134 Ill. 2d R. 238(a).) However, a witness cannot be impeached by a prior inconsistent statement unless her testimony has damaged, rather than failed to support, the impeaching party's position. *People v. Weaver* (1982), 92 Ill. 2d 545, 563; *People v. Spence* (1989), 188 Ill. App. 3d 761, 765.

■ We agree with defendant that Lovings was improperly impeached. Lovings' testimony did not damage the State's case because Lovings provided *no* in-court testimony to impeach. At trial, Lovings was asked whether she knew defendant, Clementhis or Ricky, and whether she recalled when Simmons disappeared. Then the following colloquy took place:

"Q. Do you remember talking to Agent Mark Fritz of the Department of Criminal Investigation on September 28th, 1989?

A. I am not sure.

\* \* \*

Q. Mark Fritz, blond-haired fellow, Department of Criminal Investigation, a police officer, do you remember talking to him about Billy Joe the victim?

A. I am not sure. I talk to a lot of officers.

Q. Okay. Do you remember talking to an officer about the disappearance of Billy Joe Simmons?

A. Yes, somebody came out to my house and I was questioned.

\* \* \*

Q. That was around September 28th, 1989?

A. I am not sure.

Q. Okay. Do you remember telling Agent Mark Fritz that you were with a fellow by the name of McDory the night Billy Joe Simmons was last seen?

A. No.

Q. Do you remember telling Agent Fritz that you saw Clementhis Lambert, Ricky Lambert, Timothy Chatmon and Billie Simmons arguing that night?

A. No.

Q. Do you remember telling Agent Fritz that you heard gunshots coming from those individuals and observed Clementhis Lambert, Ricky Lambert and Timothy Chatmon depart in Clementhis Lambert [sic] Cadillac Seville and Ricky's Cadillac Sedan Deville?

A. No.

Q. Do you remember telling him the next morning you noticed a trail of blood spots leading from a location where those individuals were arguing to the parking lot in Chestnut Court?

A. No."

Lovings was never asked to testify about what happened the evening of August 6, 1989, but was only asked if she recalled making a statement to the police. As such, Lovings could not be impeached. Although we believe that an inconsistent statement in the literal sense is not required before a witness may be impeached (see *People v. Amato* (1984), 128 Ill. App. 3d 985, 987), the witness must testify concerning his or her knowledge, or lack of it, about the incident in question before impeachment is allowed.

Having determined that an error occurred, we must decide whether reversal is required. An error is harmless where there is sufficient competent evidence establishing defendant's guilt beyond a reasonable doubt, and defendant cannot show that the error was the basis for the jury's verdict. (*Spence*, 188 Ill. App. 3d at 766.) The defendant has the burden to demonstrate prejudice and to establish the reasonable probability that the error was a material factor in the conviction. *Spence*, 188 Ill. App. 3d at 766.

In this case, there was sufficient independent evidence of the argument and shooting among defendant, Clementhis, Ricky and the victim at the Champion Park apartments. Mullins testified in detail about the incident. Louis Leavy's statement to the police also provided corroborating evidence of the argument and shooting. Also, Roshell Woods testified that he heard the argument and the gunfire

and saw two Cadillacs drive away from the area. Thus, Lovings' prior inconsistent statement was cumulative and, therefore, harmless.

Further, we disagree with defendant's contention that the State relied substantively on Lovings' prior statement. Lovings' prior statement was not admitted into evidence pursuant to section 115—10.1 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 115—10.1). The State's reference to Lovings' testimony and prior statement during closing argument compounded the impeachment error committed by the State, but was not an attempt to argue the substance of her prior inconsistent statement. Thus, defendant's reliance on *People v. Yarbrough* (1988), 166 Ill. App. 3d 825, is misplaced because there the prosecutor moved to admit a witness' prior statement and grand jury testimony as substantive evidence.

### EVIDENCE DEPOSITION

At issue is whether the trial court erred in excluding portions of Dr. MacLean's evidence deposition taken during Mullins' competency hearing. At the competency hearing, Dr. Donald MacLean testified that, in 1986, he had treated Lori Mullins, also known as Lori Haley, Susan Johnson, Susan Smith, Susan Anderson, Susan Greer and Kathy Green. At that time, Mullins was recovering from a gunshot wound to her head. MacLean stated that her injury affected her insight, judgment and intellectual functions. MacLean recalled reading a report where Mullins' mother thought Mullins was a pathological liar. MacLean believed that Mullins' injury made her suggestible.

On cross-examination, MacLean stated that he found Mullins' intelligence quotient (IQ) to be 69, which placed her in the mildly retarded range. MacLean believed that her condition was stable, and he expected no significant improvement.

MacLean also found that Mullins had a personality disorder which manifested itself in psychopathic-like traits. MacLean found evidence that Mullins heavily used drugs. Mullins was more likely than the average person to misinterpret facts. However, MacLean stated that Mullins was able to communicate and appreciate the difference between the truth and a lie. MacLean acknowledged that he had not examined Mullins since September 1986.

Following the hearing, Mullins was found competent to testify. MacLean stated at the competency hearing that he would be unable to testify at defendant's trial. The court ordered that, pursuant to Supreme Court Rule 414 (134 Ill. 2d R. 414), MacLean's testimony would be treated as an evidence deposition.

Among the motions *in limine* presented before trial was the State's motion to exclude the evidence deposition of MacLean. The trial court made the following ruling:

"Defendant has a right to have the testimony of Dr. McLean [*sic*] heard by the trier of fact regarding the mental capacity of the witness and the condition of her comprehension at the time that he examined her in 1986. The doctor, however, in his deposition may not express any or quote from any statement by any other person purporting to have diagnosed the witness as a pathological liar or to the fact that the Defendant contradicted her use of controlled substances or any opinions by that doctor as to the present condition of the witness."

However, defendant did not present any portion of MacLean's evidence deposition at trial.

Defendant contends that the edited version of Dr. MacLean's testimony left Mullins' psychological condition incomplete and "critically handicapped" the jury in exercising its duty to weigh Mullins' credibility. Defendant argues that he was denied effective examination of a witness' mental history and condition.

The State contends that defendant has waived this issue for failing to present any of Dr. MacLean's testimony at trial and failing to include this issue in his post-trial motion. Absent waiver, the State argues that the portion edited from Dr. MacLean's testimony was speculative analysis that was not testified to based on a reasonable degree of medical certainty.

While defendant included this issue in his post-trial motion by arguing that the trial court erred in granting the motion *in limine* pertaining to MacLean's testimony, we find that defendant waived the issue by failing to use Dr. MacLean's testimony during the trial. The situation is analogous to a defendant failing to testify after his motion *in limine* to exclude a prior conviction for impeachment purposes is denied. Courts reason that the possible harm flowing from the ruling on the motion *in limine* is "wholly speculative." (See *Luce v. United States* (1984), 469 U.S. 38, 83 L. Ed. 2d 443, 105 S. Ct. 460; *People v. Helton* (1990), 195 Ill. App. 3d 410, 419; *People v. Rush-Bey* (1987), 152 Ill. App. 3d 17, 21-22.) Similarly, we would be speculating about the harm flowing from the exclusion of portions of Dr. MacLean's testimony where none of his testimony was presented at trial. Thus, we deem this issue waived.

■ Absent waiver, we find that defendant was not harmed by the trial court's exclusion of parts of Dr. MacLean's testimony. Motions *in limine* are encouraged in criminal cases to exclude extraneous mat-

ters. (*People v. Watkins* (1991), 220 Ill. App. 3d 201, 211.) A motion *in limine* is used in an attempt to protect the moving party from the prejudicial impact of inadmissible evidence being asked and objected to in the presence of the jury. (*Reidelberger v. Highland Body Shop, Inc.* (1981), 83 Ill. 2d 545, 549; *Cunningham v. Millers General Insurance Co.* (1992), 227 Ill. App. 3d 201, 205.) A reviewing court will not reverse the trial court's ruling on a motion *in limine* absent an abuse of discretion. *People v. Poole* (1991), 222 Ill. App. 3d 689, 701.

Before trial, the judge ruled that Dr. MacLean's testimony would be allowed. However, he excluded "any statement by any other person purporting to have diagnosed [Mullins] as a pathological liar," references that Mullins denied using drugs, and any opinion by Dr. MacLean concerning Mullins' present condition. We agree with the State that the reference to Mullins being a pathological liar was not the opinion of Dr. MacLean, but of others. Also, Dr. MacLean had not seen Mullins since 1986, so his opinion about her present condition would be speculative.

Moreover, the remainder of Dr. MacLean's testimony would have demonstrated Mullins' limited mental capacity. MacLean testified that she had intellectual dysfunction resulting from a gunshot wound to the head; she had a personality disorder; she had an IQ of 69, putting her in the mildly retarded range; and she was more likely than the average person to misinterpret facts. Given the remaining viability of Dr. MacLean's testimony, we hold that the trial court did not abuse its discretion in excluding portions of Dr. MacLean's testimony.

## NEW TRIAL

Defendant's fifth contention is that the trial court erred when it refused to rule on his motion for a new trial and, alternatively, failed to grant the motion. Defendant argues that Mullins' testimony in Clementhis' trial that defendant did not shoot the victim was newly discovered evidence that was so significant that it would probably change the result on retrial. Defendant also argues that the affidavit of Latanya Latin is evidence that her boyfriend, Jessie Leach, killed the victim.

The State contends that Mullins' testimony at Clementhis' trial does not negate the fact that defendant was an accomplice in the victim's murder. The State argues that Mullins remained steadfast that defendant was at the scene assisting the Lambert brothers and had pulled out a gun and reached over the victim with the weapon. The State concludes that Mullins' subsequent testimony does not require that defendant receive a new trial.

A defendant is entitled to a new trial based on newly discovered evidence if: (1) the evidence is of such a conclusive character that it will probably change the result upon retrial; (2) the evidence is material and not cumulative; and (3) the evidence was discovered after the trial and was not discoverable before trial through the exercise of due diligence. (*People v. Molstad* (1984), 101 Ill. 2d 128, 134; *People v. De-Cesare* (1989), 190 Ill. App. 3d 934, 943.) A motion for a new trial is not favored and will be subject to the closest scrutiny. (*DeCesare*, 190 Ill. App. 3d at 943.) The trial court's decision to deny a motion for new trial will not be disturbed absent an abuse of discretion. *People v. Miller* (1980), 79 Ill. 2d 454, 464.

■ Initially, we disagree with defendant's contention that the trial court failed to rule on his motion. In denying the motion, Judge Robert Coplan, who heard the motion after Judge John Sype's retirement, stated in part:

"I have read everything that has been presented. I believe I have read all of the record, which is pertinent to what I believe counsel for both sides would agree is the central issue in the Motion to Reconsider, and that's the testimony of Lori Mullins and her competennce [*sic*] as a witness or lack thereof.

\* \* \*

The Motion for a New Trial was directed to the trial judge, who presided over the trial and entered judgment on the verdict, and that judge participated in all of the trial proceedings and pretrial proceedings and had the opportunity to observe the demeanor of the witness as did the jury, and I don't have the advantage of having done any of that. So I have to determine in my judgment, based upon only the written record whether or not there is a basis to overturn Judge Sype's motion, which denied a new trial.

In my opinion that would require me to function as an Appellate Court in this matter. I think that is not appropriate.

Based on the entire record in the case, I at this time have to deny the Motion to Reconsider and I do so."

Judge Coplan clearly ruled on the motion. His acknowledgement that he was at a disadvantage because he did not hear the case was not a failure to rule on the motion.

■ We also hold that the trial court did not abuse its discretion in denying the motion. Mullins' testimony at Clementhis' trial was consistent in that defendant was at the scene of the murder and had his gun drawn. She testified that she did not hear or see a shot fired:

"Q. What happened to Billy Joe the victim after the second shot was fired?

A. He dropped to the ground.

Q. Tell us what happened?

A. Timothy Chatmon pulled from under his shirt a gun and Billy Joe Simmons was lying down and Timothy Chatmon reached over him with his gun but I didn't hear or see a shot fired then.

\* \* \*

Q. You lied to these people 15 minutes ago when you said you didn't see Timothy Chatmon with a gun.

A. No.

Q. Well, you saw it or you didn't see it?

A. He did have a gun.

Q. But you didn't see him shoot it; is that right?

A. No, I didn't."

Further, Mullins' testimony at Clementhis' trial was not conclusive that she did not see defendant fire a shot. After the above testimony, she testified as follows:

"Q. Were you lying to the Grand Jury again?

A. I seen [*sic*] him pull out a gun and fire a shot in the direction but no."

Viewing Mullins' testimony at Clementhis' trial as a whole, we find that it is not of such a conclusive character that it would probably change the result on retrial. Moreover, even if Mullins did not see defendant fire a shot at the victim, defendant's participation in the victim's murder was equivalent to that of an accomplice. As such, defendant could be found guilty of first-degree murder without firing a shot. See Ill. Rev. Stat. 1989, ch. 38, pars. 5—2(a), 5—3.

The case primarily relied upon by defendant, *Molstad* (101 Ill. 2d 128), is distinguishable. There, the newly discovered evidence consisted of affidavits from the five codefendants, which stated that the defendant was not present at the time of the crime. (*Molstad*, 101 Ill. 2d at 132.) Here, the newly discovered evidence is not as significant. As we previously stated, even if Mullins' testimony at Clementhis' trial is considered, defendant would still be found guilty of murder under an accountability theory.

Finally, the affidavit of Latanya Latin also does not rise to the level of conclusive evidence. Although her affidavit hints at Jessie Leach's apparent intent to kill the victim and his belief that the victim was dead, there is no testimony placing Leach at the scene of the

murder or demonstrating his participation in the murder. Without more, the affidavit does not mandate that we order a new trial.

## EXCESSIVE SENTENCE

The final issue on review is whether defendant's sentence of 35 years' imprisonment is excessive. Defendant argues that his sentence is disparate to that of Ricky, who received a 40-year term. Defendant claims that Ricky had a more extensive criminal record, Ricky's participation in the victim's murder was greater, and Ricky had less rehabilitative potential.

The imposition of a sentence is a matter within the trial court's discretion, and its decision will not be reversed absent an abuse of discretion. (*People v. Wilson* (1991), 143 Ill. 2d 236, 250.) The trial court's decision regarding sentencing is given great deference and weight. (*People v. James* (1987), 118 Ill. 2d 214, 228.) The trial court has abused its discretion in imposing a sentence when the judgment is manifestly unjust or palpably erroneous. *People v. Anderson* (1986), 112 Ill. 2d 39, 46.

We hold that defendant's 35-year sentence was neither disparate nor excessive and the trial court did not abuse its discretion in imposing the sentence. Defendant received a shorter sentence than Ricky, in part, because of his less serious criminal record. However, based on past criminal convictions alone, defendant did not deserve a significantly shorter sentence because he had been convicted previously of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2), unlawful use of weapons (Ill. Rev. Stat. 1989, ch. 38, par. 24—1), and a violation of the Cannabis Control Act (Ill. Rev. Stat. 1989, ch. 56½, par. 701 *et seq.*).

Further, defendant's rehabilitative potential was acknowledged by the trial court. The trial court discussed the violent nature of the offense and the fact that defendant's violent conduct dated back to his 1976 arrest for armed robbery. The trial court stated that the defendant was not "devoid of rehabilitation." We believe the sentence reflected a thoughtful consideration of his potential to rehabilitate. Moreover, rehabilitative potential is not entitled to greater weight than the seriousness of the offense. See *People v. Smith* (1991), 214 Ill. App. 3d 327, 341.

Finally, defendant's argument that Ricky's participation in the victim's murder was greater is unpersuasive. Although the evidence hints that Ricky may have had a stronger motive to kill the victim, defendant was at the scene of the crime, fired a shot at the victim, and helped in disposing of the victim's body. Defendant's participation

in the actual killing of the victim was nearly identical to Ricky's participation.

For the foregoing reasons, the judgment of the circuit court of Winnebago County is affirmed.

Affirmed.

DUNN, J., concurs.

JUSTICE McLAREN, dissenting:

I must respectfully dissent. I authored *People v. Lambert* (2d Dist. May 19, 1992), No. 2—90—0363 (unpublished order under Supreme Court Rule 23), which was a Supreme Court Rule 23 dispositional order which reversed the judgment and remanded the cause on other grounds. Frederick Lambert was one of three defendants charged with Mr. Simmons' homicide. Mr. Chatmon, defendant herein, and Clementhis Lambert were the two other defendants charged. I do not cite to the *Lambert* disposition as precedent but rather to show that I remain consistent in my judgment as to the weight attributed to Lori Mullins' testimony. I wrote therein:

"It would be unjust to convict defendant based upon Mullins' statements alone. However, other evidence was provided by the State which would, if believed, be sufficient to both corroborate certain aspects of Mullins' testimony and support a conviction. Most notably, we refer to the statements Louis Leavy gave to the police. Leavy's statements tend to incriminate defendant." *Lambert*, slip R. 23, at 6.

In the above-cited *Lambert* case, Stacy Lovings' testimony was presented to the jury, and the jury was properly instructed to use the prior statements made by Lovings only for purposes of impeachment. In the present case, her prior inconsistent statements were improperly submitted as substantive evidence.

I must disagree with the majority that the defendant has not shown reversible error. I reasonably believe the jury could have found Mr. Chatmon not guilty if Stacy Lovings' testimony had been properly presented to the jury. I, therefore, would determine that reversible error was committed and remand the cause for a new trial.