THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. SUNDELEEN Y. FRAZIER *et al.*, Defendants-Appellees.

Second District   Nos. 2—91—0718, 2—91—0719 cons.

Opinion filed July 29, 1993.

James E. Ryan, State's Attorney, of Wheaton (Barbara A. Preiner, Assistant State's Attorney, and William L. Browers and Gregory L. Slovacek, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellee Sundeleen Frazier.

John F. Donahue, of Donahue, Sowa & Bugos, of Lisle, for appellee Kassandra Person.

JUSTICE DOYLE delivered the opinion of the court:
Defendants, Sundeleen Y. Frazier and Kassandra Person, were both indicted on three counts of retail theft in excess of $150 (Ill. Rev. Stat. 1991, ch. 38, pars. 16A—3(a), 16A—10(3) (now 720 ILCS 5/ 16A—3(a), 5/16A—10(3) (West 1992))). Defendants each brought a motion to suppress evidence seized by police after a *Terry* stop (see *Terry v. Ohio* (1968), 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868) of their vehicle on March 28, 1991. Following a joint evidentiary hearing, the trial court granted defendants' motions. The State filed timely certificates of impairment and notices of appeal with respect to each defendant. The only issue raised is whether the trial court erred

in finding that the police lacked a reasonable, articulable basis to stop defendants' vehicle.

Thomas Sheehan, a police officer for the City of Naperville, testified at the evidentiary hearing that on March 28, 1991, he was assigned to the special enforcement team, a plainclothes patrol unit. His duties included patrolling "major high crime areas," in particular retail malls. At approximately 4 p.m., Sheehan and his partner, Officer Trotsky, were in an unmarked car in the Montgomery Ward's Kids Store (store) parking lot of the Westbridge Court Mall. Sheehan observed defendants and another individual riding in a blue Pontiac Sunbird. Sheehan stated that he had a clear view of the vehicle and its occupants. He identified Frazier as the driver and Person as the front seat passenger. He said that a third individual was seated in the rear of the vehicle. The car parked approximately 50 feet in front of Sheehan's location. Sheehan testified that both defendants exited the vehicle and entered the store together while the other passenger stayed in the car. Frazier was wearing a long, very bulky coat and had nothing in her hands. Person was also wearing a long coat and had nothing in her hands.

Approximately 10 minutes later, Frazier exited the store and returned to the Sunbird. She was not carrying bags or anything else in her arms. Sheehan stated that Frazier's "coat was open, it was not buttoned so I could tell her midsection appeared to be larger than when she first went in." Aside from noting that Frazier appeared to have gained weight since she entered the store, Sheehan stated that, at her midsection, Frazier's coat looked bulkier than it had when she entered the store. After Frazier got into the Sunbird, Sheehan observed her "[m]aking numerous arm movements, body movements, moving back and forth." He described these movements as being "[t]owards her body, towards her midsection," and stated that "[a]fter these numerous movements of her hands moving toward her body she then at one point leaned completely over laying [sic] down into the front passenger seat and then came back up again. *** While she was making these movements the brake lights kept going on and off in the car and at one point the left turn signal actually activated." Sheehan acknowledged that the Sunbird had bucket seats which reached to the low part of Frazier's back and that he could not see anything being pulled away from her body. Sheehan also admitted that the police report he prepared regarding this incident stated that Frazier was observed leaning over to the driver's side of the car rather than the passenger's side, but he claimed that that aspect of the report was an error.

Person left the store later. Sheehan stated, "When [Person] walked into the store her arms were at her sides. As she came out of the store her left arm was across her coat holding it tight to her body." Person was not carrying bags or anything else in her arms. Person reentered the Sunbird, and the car left the store's parking lot. Sheehan stated that he did not see anyone pass any objects from the front seat to the rear seat at any time prior to leaving the parking lot.

Sheehan testified that the Sunbird drove out of the parking lot and onto Aurora Avenue, headed toward Illinois Route 59. Sheehan and his partner followed the Sunbird in their vehicle. At the intersection of Aurora Avenue and Route 59, the Sunbird stopped for a red light. While his vehicle was stopped behind the Sunbird for "[j]ust a few seconds" at the light, Sheehan observed Person "removing clothing from the front seat with coat hangers still attached, passing it back to the person in the rear seat, who put it down either next to her or somewhere on the floor, is what it appeared." Sheehan admitted that he could not see where in the front seat the clothing had come from. Sheehan stated that the hangers were white, but he could not tell what color the clothing was. He did not see any tags on the clothing. Sheehan stated that "some clothing" was passed to the rear passenger, but he did not specify the number of articles or the type of clothing.

Sheehan stated that the vehicle turned onto Route 59 and proceeded southbound. Sheehan and Trotsky followed the Sunbird on Route 59 for approximately one-quarter mile and then stopped the car. Sheehan admits that prior to the stop he didn't communicate with anyone from the store, run a warrant check on any of the vehicle occupants, observe the Sunbird violate any traffic laws, or receive any third-party information about the suspects.

Dale Trotsky, a police officer for the City of Naperville, testified that on March 28, 1991, he was also assigned to the special enforcement team and was patrolling the Westbridge Mall with his partner, Officer Sheehan. He testified that defendants got out of the blue Pontiac Sunbird, which was parked about 25 feet away from his location, and entered the store together. Both women were wearing long jackets. He did not recall whether Frazier's jacket was opened or closed, but he stated that he could not see what she was wearing underneath it. A third individual, seated in the rear of the Sunbird, remained in the car. After about 10 minutes, Frazier exited the store and walked back to the vehicle. Trotsky testified that when Frazier came out, "[t]here seemed to be a bulge in the midsection of her per-

son which was different than her appearance when she walked into the store." When asked to describe what he meant by a bulge, Trotsky stated, "It was large in nature to the point where you would think that somebody would be pregnant or something like that." Trotsky stated that when Frazier left the store, her jacket was closed, and he admitted that he could not tell what she was wearing underneath it.

Trotsky testified that Frazier got into the driver's seat of the Sunbird, and he made the following observations:

"She conducted—there was a lot of motion in regards to reaching down, pulling up, continually, the arms going up in the air and down, you know. There was a pulling motion within her own person, is the best way to describe it. *** Her hand motions were specific to where she was sitting, not anywhere else in the vehicle but just where she was. *** While she was motioning up and down pulling, making pulling motions, the brake lights on her vehicle were going on and off. She appeared to be tapping the brake, and at one time she made a gesture bearing down to her right as to like lay [sic] down on the front seat, at which time she moved back up and the turn signal on the vehicle, left turn signal on the vehicle had gone on."

Trotsky stated that at the time Frazier lay down, "[y]ou could still see part of a person, noting that there was motion within the front portion of the vehicle." He admitted that the Sunbird's trunk and seats obstructed his view of the car's occupants, and he was unable to see below their shoulders. Trotsky testified that Frazier's motions could be characterized as either "pulling" or "pushing" motions. Trotsky also stated that at the time Frazier entered the car she began handing items to the passenger in the backseat, but he could not tell what the items were.

Person left the store about five minutes after Frazier had returned to the Sunbird. Trotsky stated that Person was clutching her jacket when she returned to the car, and she was not carrying any bags. After Person got into the front passenger's seat, the Sunbird drove out of the parking lot. It proceeded down Aurora, stopping for a red light at the intersection of Aurora and Route 59. While the vehicle was stopped, Trotsky saw Person handing clothing over the seat to the other passenger, and he could see that the clothing was still on a hanger. He did not recall what type of clothing it was, and he stated that he did not see any tags hanging from the clothing. Trotsky went on to testify that the passenger in the rear of the vehicle made a mo-

tion as if to receive the property or items and then made a motion down to the floor area or the area next to her.

Trotsky testified that he did not see either defendant carrying any clothing with her when she exited the car, or when she later entered the car. Trotsky could not recall what type of seats the Sunbird had.

The trial court granted defendants' motions, commenting:

"[L]ooking at the facts in our case you have got the three people in the car, they are observed pulling into the parking lot, two of them go into the store, and the officers, there is some impeachment between the officers' testimony, although not a lot, but the two women come out separately. *** [A]s far as the fact that they come out separately *** to me that doesn't really mean much at all, probably happens all the time. If I were to go shopping with my wife and I might get a little tired and might go out to the car to listen to a sporting event or something like that. So the fact that they come out of the store I don't think really is any kind of a fact that the State can point to.

The one fact that *** the State is emphasizing is that apparently when one defendant came out of the store, it appeared to the officers that—in the language of the one officer was that the midsection of the defendant appeared to be larger. Officer Trotsky, I think, referred to it as a bulge. I think that is perhaps a fact, one part, one fact that the State can point to.

But some other things that have been mentioned by the State *** the second defendant in the store hadn't come back out to the car yet, the other individual in the car appeared to be nervous and looking around. Is it so unusual that a person in a car while another person is in the store might be looking around trying to see if that person is coming out of the store yet? I don't know that you can put any criminal, necessarily put any kind of a criminal attachment to those actions.

When the third person does come out of the store going to the car she has an arm close to the body. Again, can we necessarily attach any criminal activity to that?

After all three people are in the car the car then leaves. The officers follow the car and they see some clothing being passed, and the clothing had hangers on it from the front to the back. Officer Trotsky also testified as to his observing some movements prior to the car moving, and Officer Sheehan did, too, but from their standpoint they really weren't able to see what they were doing, they were just able to see some movements. I

don't know that you really can say that these are furtive movements. *** But I think basically what you have here, the car is in a regular parking space, the mall is open, two people walk into a store, they are not wearing any unusual clothing, the police have never seen these individuals before, they have had no prior contact with these individuals before. In the whole time they are observing them at least up until the stop there's been no communications with the store. The officers are unaware that a crime occurred.

The facts that I think we are expected to look at here are basically the one coming out of the store with some kind of a bulge or whatever and then after the car moves some clothing is being handed back and that clothing is still on hangers."

The State argues that the trial court committed error by granting defendants' motions to suppress. Defendants respond that the trial court properly found that the officers lacked a reasonable, articulable basis to justify stopping of defendants' vehicle. Initially, the State asserts that because neither the facts nor the credibility of the witnesses was at issue, the trial court's ruling should be reviewed *de novo*. (See *People v. Abney* (1980), 81 Ill. 2d 159, 168; *People v. Eyler* (1985), 132 Ill. App. 3d 792, 798.) Defendants respond that the trial court's ruling must be affirmed unless it was manifestly erroneous. See *People v. Grice* (1980), 87 Ill. App. 3d 718, 722.

■■ As a general rule, the law provides that each case must be decided on its own facts, and a trial court's ruling on a motion to suppress will not be disturbed unless it was manifestly erroneous. (*People v. Clark* (1982), 92 Ill. 2d 96, 99; *People v. Galdine* (1991), 212 Ill. App. 3d 472, 478; *People v. Bujdud* (1988), 177 Ill. App. 3d 396, 401.) This standard is clearly applicable where the motion turns upon findings of fact determined through an assessment of the weight and credibility of the evidence. (See *People v. Loftus* (1983), 111 Ill. App. 3d 978, 981-82; *People v. Jennings* (1989), 185 Ill. App. 3d 164, 170.) However, suppression motions are best characterized as raising mixed questions of fact and law, and, if all factual disputes in a case have been resolved, then only a question of law remains. (See, *e.g.*, *People v. Foskey* (1990), 136 Ill. 2d 66, 76; *Eyler*, 132 Ill. App. 3d at 798; *Loftus*, 111 Ill. App. 3d at 982.) Therefore, it is important to note the difference between a ruling rendered by applying the law to stipulated or undisputed facts and the process of evaluating the credibility of testimony and weighing evidence. (See *Loftus*, 111 Ill. App. 3d at 981-82.) Where both the facts and the credibility of the witnesses are uncontroverted, the

question presented becomes a legal one, subject to *de novo* review. (*Foskey*, 136 Ill. 2d at 76; *Abney*, 81 Ill. 2d at 168; *Galdine*, 212 Ill. App. 3d at 478-79.) Also, if it is apparent that the trial court's ruling on a motion to suppress was entirely based on a witness' testimony which it has accepted as credible, and there is no ground upon which the trial court's credibility determination can be rejected as "clearly unreasonable," then a reviewing court need only determine, as a matter of law, whether the witness' testimony satisfies the applicable legal requirements. See *Clark*, 92 Ill. 2d at 99.

Because the trial court has heard the testimony, seen the witnesses, and had the opportunity to observe their demeanor, it is in the best position to judge the witnesses' credibility, determine the weight to be accorded their testimony, decide the inferences to be drawn from the evidence, and resolve any conflicts in the evidence. (See *People v. Reid* (1990), 136 Ill. 2d 27, 61.) A reviewing court will not substitute its judgment on these matters for that of the trial court unless it finds the court's ruling to have been manifestly erroneous.

Although the trial court noted that there were minor inconsistencies in the testimony given by Sheehan and Trotsky, it resolved those conflicts and made specific findings of fact. The court commented that the "articulable facts" being asserted in support of the *Terry* stop were that the officers had observed Frazier "coming out of the store with some kind of bulge *** and then after the car moves some clothing is being handed back and that clothing is still on hangers." Because the largely uncontroverted record before the trial court supported its findings of fact, we need only review whether, as a matter of law, those facts were sufficient to provide the officers with a basis for their investigatory intrusion.

■ A police officer may stop and temporarily detain an individual for the purpose of a limited investigation if the officer is able to point to specific articulable facts which, taken together with reasonable inferences drawn from the officer's experience, reasonably would justify the investigatory intrusion. (See *Terry*, 392 U.S. at 30, 20 L. Ed. 2d at 911, 88 S. Ct. at 1884; see also Ill. Rev. Stat. 1991, ch. 38, pars. 107–14, 108–1.01 (now 725 ILCS 5/107–14, 5/108–1.01 (West 1992)).) To determine whether an investigatory stop was based upon a reasonable, articulable suspicion of criminal activity, an objective standard must be applied by the court (*Bujdud*, 177 Ill. App. 3d at 401), and a mere hunch or general suspicion is insufficient. (*Eyler*, 132 Ill. App. 3d at 800.) A stop is proper only if the facts available to the officer would warrant a man of reasonable

14

caution to believe that the action taken was appropriate. (*Bujdud*, 177 Ill. App. 3d at 401; *People v. Ellis* (1983), 113 Ill. App. 3d 314, 318.) "Reasonableness" can be found if the facts and circumstances are both specific and articulable. (*People v. McGowan* (1977), 69 Ill. 2d 73, 78.) An investigatory stop may also be justified through the use of rational inferences drawn from facts known to the officers. (*Bujdud*, 177 Ill. App. 3d at 401.) Viewed as a whole, the facts and inferences relied upon must lead to the conclusion that the situation is so far removed from the ordinary that any competent police officer would be expected to act quickly to maintain the status quo, rather than observe the situation further. *McGowan*, 69 Ill. 2d at 78.

■ We recognize the significance of the circumstance that the stop in question was not based upon a general suspicion of some indeterminate criminal activity but, rather, upon a suspicion that defendants had perpetrated a specific crime. The facts which the officers articulated, and the trial court found, directly relate to the specific crime that the officers suspected defendants to have committed. When considering whether an officer was justified in making an investigatory stop, the facts need not be viewed with analytical hindsight, but instead should be considered from the perspective of a reasonable officer at the time that the situation confronted him or her. (*People v. Scott* (1992), 148 Ill. 2d 479, 503.) A *Terry* investigatory stop contemplates a brief intrusion, as minimal as possible, to verify information or to ascertain whether criminal activities have in fact taken place. (*People v. Schacht* (1992), 233 Ill. App. 3d 271, 275.) The scope of an investigatory encounter and the coextensive intrusion upon the individual stopped is minimized where, as here, the suspicions of police are directed to a specific offense, enabling the officers to proceed with a brief, investigative detention, *i.e.*, to verify that the clothing passed to the rear seat passenger was not stolen from the store. This circumstance, in our view, strengthens the State's position in the present case.

■ While recognizing that the officers' testimony was somewhat inconsistent, the court found that Frazier was observed to have a noticeable bulge around her midsection when she left the store. The court also noted that some clothing was being passed to the backseat while the car stopped for a traffic signal. The trial court correctly noted that many of the officers' observations were consistent with innocent activity. Also, the court may have been legitimately concerned with a lack of specificity with respect to some of the observations. For example, no testimony was provided con-

cerning the number of items passed to the backseat. Nor were the officers able to describe the articles of clothing they saw, such as the type of clothing or whether it appeared to be children's wear, or whether tags or labels were attached. These factors could have borne upon the weight of the testimony; however, the court did ultimately make specific factual findings, and those findings are supported by the record and provide a sufficient basis for our *de novo* review. Once the trial court determined that the officers had observed specific actions and details, only a question of law remained.

Although it is understandable that the trial judge may have been led to a different conclusion, upon further examination of the facts, it is our view that the police officers had more than a mere hunch or general suspicion of undefined criminal activity. They observed that Frazier's appearance had changed significantly when she emerged from the store. The noticeable bulge which appeared around her waist triggered the officers' suspicions that Frazier might be perpetrating a retail theft. The officers then focused their attention upon the suspects and saw clothing *on hangers* being passed from the front of defendants' vehicle to the backseat passenger. When these observations are viewed in the context of the otherwise innocuous facts that neither defendant was carrying bags with possible purchases when they left the store, and Frazier's unusual movements after entering the car, we conclude that the officers had a reasonable, articulable basis for intruding temporarily upon defendants' freedom of movement by stopping the vehicle to conduct a brief inquiry into the matter.

For the foregoing reasons, the order of the circuit court granting defendants' motions to suppress evidence is reversed, and the cause is remanded for further proceedings.

Reversed and remanded.

INGLIS, P.J., and COLWELL, J., concur.