THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DEON PATRICK, Defendant-Appellant.

First District (2nd Division)   No. 1—95—2115

Opinion filed July 7, 1998.

COUSINS, J., specially concurring, joined by McNULTY, P.J.

Lynda J. Khan, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Sari London, Assistant State's Attorneys, of counsel), for the People.

JUSTICE TULLY delivered the opinion of the court:

Defendant, Deon Patrick, was charged by indictment with eight counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1 (now 720 ILCS 5/9—1 (West 1996))), two counts of home invasion (Ill. Rev. Stat. 1989, ch. 38, par. 12—11(a) (now 720 ILCS 5/12—11(a) (West 1996))), and one count of armed robbery (Ill. Rev. Stat. 1989, ch. 38, par. 18—2(a) (now 720 ILCS 5/18—2(a) (West 1996))). Following a jury trial, defendant was convicted of two counts of murder, two counts of home invasion, and one count of armed robbery. He was sentenced to natural life in prison without parole for murder and 30 years' imprisonment each for home invasion and armed robbery. All sentences are to be served concurrently. Defendant now appeals his conviction pursuant to Supreme Court Rule 603 (134 Ill. 2d R. 603).

For the reasons that follow, we affirm.

## FACTUAL BACKGROUND

The pertinent facts are as follows. One of the victims in this case, Jeffrey Lassiter, lived at 910 W. Agatite in Chicago. Delone Garner, a manager for Urban Service Realty, maintained the building located at 906-916 W. Agatite in Chicago. On November 16, 1992, at approximately 8:30 p.m., Garner, who lived in the apartment directly above Lassiter, heard loud noises and gunshots coming from downstairs. After a few minutes, Garner called Lassiter's name, went downstairs, and found that someone had broken into Lassiter's apartment. Garner went inside Lassiter's apartment and found Lassiter shot in the head. Garner found that the other victim, a young woman later identified as Sharon Haugabook, was also shot. Garner ran back to his apartment and called the police.

In connection with the victims' deaths, defendant was later arrested and charged with eight counts of first degree murder, two counts of home invasion, and one count of armed robbery.

A. Pretrial proceedings: Motion to Quash Arrest and Suppress Evidence

Defendant filed a motion to quash arrest and suppress evidence on the basis that the police did not have probable cause to enter his home without an arrest warrant and that his statements to the police and the assistant State's Attorney were not voluntary. The State first presented Detective Tony Villardita at the motion to quash hearing.

Detective Villardita testified that, on the date in question, he investigated a double murder at 910 W. Agatite. He recounted that, when he arrived at the apartment, he observed that Lassiter was dead, and he knew that Haugabook had also died upon her arrival at

the hospital. Detective Villardita interviewed a witness, Faye McCoy, who was one of the residents of the 906-916 W. Agatite building complex. On November 16, 1992, McCoy heard gunshots and immediately looked out her window. She observed two males coming out of the entrance, and two other males shortly followed. McCoy told Detective Villardita that she recognized one of the males, who went by the name "Goldie." Subsequently, McCoy viewed the lineup in relation to the homicides, told Detective Villardita that she knew four of the people, and identified defendant, Daniel Taylor, Rodney Matthews, and Paul Phillips. She said she did not know their names, but knew they were from the 910 W. Agatite area. She also told Villardita that she was afraid and would not go to court. She did not tell Detective Villardita that defendant was definitely not one of the four men who came out of the building.

Detective Villardita further testified that on December 2, 1992, he arrived at the police station and learned that Lewis Gardner and Akia Phillips were in custody for another unrelated offense. They claimed to have information about the Lassiter and Haugabook homicides. Gardner stated that he was a member of the Vice Lords gang and that he was informed at a meeting at Clarendon Park that drug money was to be collected from Lassiter. After receiving their instructions, eight gang members went to Lassiter's apartment. Gardner and three other members were assigned to be the lookouts, while four other members, including defendant, went into Lassiter's apartment to collect the money. Gardner recalled hearing gunshots, and shortly after, defendant and the others came out and defendant yelled "almighty," meaning the job was completed. When shown a picture of defendant, Gardner identified him as "C-Deon." Detective Villardita stated at the hearing that Phillips told a similar story to Detectives Terry O'Connor and Ricardo Abreu.

Next, the State presented Detectives O'Connor and Abreu, who testified that in an interview with Phillips on December 2, 1992, they learned that some members of the gang planned to go to Lassiter's apartment. Phillips stated that defendant had shot the victims, but the detectives were unsure what Phillips' role was. Subsequently, Detective O'Connor checked defendant's police record and found that he was on parole and that his last known address was 1637 S. Springfield in Chicago. When the detectives arrived there at around 11:15 p.m. on December 2, they knocked on the door and defendant's grandmother answered and informed them who she was. The detectives inquired whether defendant was present, and the grandmother answered "he's all the way in the back" and gestured over her shoulder toward the back. Detective O'Connor stated that they did not have

to be let into another door and he "was under the impression that it was all one residence since grandma walked [them] back to where [defendant] was." They went to the back of the apartment and found defendant there along with several other people. Subsequently, defendant was arrested and given his *Miranda* rights.

Detective O'Connor further stated that they arrived at the police station at approximately 11:45 p.m. Defendant was placed in an interview room, his handcuffs were removed, and he was told that he had been arrested because his name was mentioned in connection with the double murders that occurred on W. Agatite. Defendant denied knowing anything about the double murders. Prior to leaving the station at 10 a.m. the next day, Detective O'Connor asked defendant whether he wanted food or wanted to use the washroom, to which defendant responded he did not want either.

At approximately 8:30 p.m., a six-person lineup was conducted. After the lineup, Detective O'Connor had another conversation with defendant. Defendant was read his *Miranda* rights and told that Phillips, Gardner, and Daniel Taylor had identified him as the shooter. Subsequently, defendant made a statement during which Detective Abreu was also present. Defendant later made the same statement to Assistant State's Attorney Joe Magats, who proceeded to prepare defendant's statement. Defendant then reviewed and signed it. On cross-examination, Detective O'Connor stated that he never attempted to get an arrest warrant for defendant. He also stated that defendant was not identified in the lineup.

The defense presented defendant's cousin, Keona Scott, who was living at 1637 S. Springfield when defendant was arrested. Scott testified that she was living in the first-floor rear apartment with defendant and her son, while her grandmother was living in the first-floor front apartment. Scott explained that there is a separate entrance for the rear apartment with a separate lock. On December 2, 1992, police officers came to her door and asked for defendant but did not show her any identification. She stated that she asked them to wait outside, but they came in right behind her, with their guns drawn. The police then grabbed defendant and handcuffed him.

Defendant testified on his own behalf. He confirmed that he was living with his cousin in the rear apartment on December 2. He stated that a doorway in his grandmother's apartment opens to a hallway which then leads to defendant's apartment. Defendant recalled that he was in his room when he heard his cousin call his name. When he came out of his room, his cousin was halfway through the living room with the police officers following right behind her. Detective O'Connor grabbed defendant and handcuffed him. Detective Abreu searched his

bedroom, while another officer was let in the back door. The police put defendant in the car and told him they had some of his friends at the station who said that defendant knew something about the murders that took place on W. Agatite. Defendant said he did not know anything about the murders. Defendant claimed that he was handcuffed to a ring on the wall all night at the police station. Defendant also said that he was not read his *Miranda* rights and he specifically asked for permission to call his lawyer, Sheila Kalish, but was not allowed to do so.

In rebuttal, Detective Abreu's testimony was basically the same as Detective O'Connor's. Detective Abreu stated that they peaceably entered the rear apartment. He also explained that he did not let other officers in the back door and did not search defendant's bedroom. Detective Abreu recalled that defendant never said that he wanted to talk to his lawyer and defendant was not handcuffed when he was placed in the interview room.

The trial court denied defendant's motion to quash arrest and suppress evidence, finding that the police had probable cause to arrest defendant based on the corroborated statements of Gardner and Phillips, who said that defendant was involved in the double homicide. The trial court also held that defendant's grandmother consented to the officers' entry into the home. Although defendant's cousin said there was a second apartment, the trial court stated "the police say that didn't happen" and found the police more credible. Finally, the trial court found that defendant was not coerced and his statement was voluntary.

## B. Trial

The following facts were adduced at trial. Stephanie Webb, a friend of Lassiter, testified that during October and November 1992 she visited Lassiter almost every day. During that time she met Sharon Haugabook, who was staying at Lassiter's apartment, and Goldie, who sold drugs. Goldie claimed that he was the only one who could sell drugs out of Lassiter's house. Although Webb had seen defendant in the area, she had never seen him in Lassiter's apartment.

On November 10, 1992, a week before the shooting, Officer William Baxter responded to a call for battery at Lassiter's apartment. Lassiter had a bruise on his face and a laceration on his mouth and told Baxter that some of his partners had beaten him up. Lassiter was treated at the hospital but refused to divulge who hurt him.

That same day, Delone Garner noticed that Lassiter was beaten up and that his face was bloody. Garner watched an ambulance take Lassiter away and he saw the police arrive. Garner observed that a lot of

people came in and out of Lassiter's house, during all hours of the night.

Officer Richard Fournier, a firearms examiner, examined the bullets that were recovered from Lassiter's and Haugabook's bodies. In his opinion, the bullets in both bodies were fired from the same weapon. The murder weapon was not recovered.

Assistant State's Attorney Magats testified that, in defendant's statement, defendant stated that he had been a member of the Conservative Vice Lords gang for 11 years and his gang name was C-Deon. On November 16, 1992, defendant attended a gang meeting where Dennis Mixon, whose gang name was Goldie, said that they were going to a man's apartment to collect money he owed Goldie for drugs. Daniel Taylor, Rodney Matthews, Akia Phillips, Lewis Gardner and some others were also present for the meeting. Goldie stated that the man had not paid the money before, so they had to beat him up and break his ribs. Goldie said if the man did not have the money this time, they would have to "take care of business." They decided that defendant, Goldie, Taylor, and Matthews would go into the apartment, while the others would act as lookouts for the police. After the meeting, they went to 910 W. Agatite. After they were buzzed into the building, Goldie handed defendant a handgun. They knocked on the door, Lassiter answered, and the four men went inside the apartment. Goldie began arguing with Lassiter and ordered defendant to shoot him. Defendant admitted that he shot Lassiter in the head. Defendant stated that Goldie took the gun away from defendant and shot Haugabook. Afterwards, Goldie removed money from Lassiter's pockets.

Faye McCoy also testified at trial. She stated that she had not seen the four men she had identified during the police station lineup in the 910 W. Agatite area. She also claimed that she did not tell Detective Villardita that she was afraid and would not go to court, but only said that she was afraid of courtrooms, police stations, and Goldie. She then definitively stated that defendant was not one of the four men who left the building on the night in question. The State then impeached McCoy with the prior inconsistent statements that she made to Detective Villardita.

At the end of evidence and after receiving instructions, the jury found defendant guilty of first degree murder, home invasion, and armed robbery.

## ISSUES PRESENTED FOR REVIEW

On appeal, defendant argues that: (1) the warrantless arrest was unreasonable; (2) his confession should have been suppressed because the police lacked probable cause to arrest him; (3) evidence of his gang

membership unduly prejudiced him; (4) the State's impeachment of McCoy, and its use of that impeachment as substantive evidence, deprived him of a fair trial; (5) the police officer's "deliberate" testimony that defendant was implicated by others constituted reversible error; (6) the admission of evidence that Lassiter was beaten six days before the murder constituted reversible error; and (7) the evidence was insufficient for the jury to find defendant guilty beyond a reasonable doubt.

## OPINION

We first turn to defendant's contention that the warrantless arrest was unreasonable. The State maintains that the police officers' entry into defendant's residence was based on his grandmother's consent. We agree with the State.

■ For purposes of motions to suppress, the circuit court is in the best position to determine the credibility of witnesses, to weigh testimony, and to resolve conflicts in testimony because it has heard the testimony and observed the demeanor of the witnesses. *People v. Frazier*, 248 Ill. App. 3d 6, 12-13, 617 N.E.2d 826 (1993). When reviewing a trial court's determination on a motion to quash an arrest and suppress evidence, we are not limited to the evidence presented at the pretrial hearing and we may consider evidence adduced at trial. *People v. Sims*, 167 Ill. 2d 483, 500, 658 N.E.2d 413 (1995); *People v. Barlow*, 273 Ill. App. 3d 943, 948, 654 N.E.2d 223 (1995). In cases in which a motion to suppress turns on the weight and credibility of the evidence, the circuit court's ruling on a motion to suppress will not be disturbed unless it is manifestly erroneous. *People v. Kozlowski*, 278 Ill. App. 3d 40, 44, 662 N.E.2d 630 (1996); see also *People v. Dilworth*, 169 Ill. 2d 195, 201, 661 N.E.2d 310 (1996). A ruling is manifestly erroneous if it is "palpably erroneous and wholly unwarranted or arbitrary, unreasonable, and not based upon the evidence." *People v. Mason*, 274 Ill. App. 3d 715, 719, 653 N.E.2d 1371 (1995).

■ In general, the fourth amendment of the Constitution of the United States (U.S. Const., amend. IV) and section 6 of article I of the Constitution of Illinois (Ill. Const. 1970, art. I, § 6) prohibit the police from making warrantless, nonexigent entries into a private residence to make an arrest. *Payton v. New York*, 445 U.S. 573, 63 L. Ed. 2d 639, 100 S. Ct. 1371 (1980); *People v. Foskey*, 136 Ill. 2d 66, 554 N.E.2d 192 (1990). A suspect's rights under the fourth amendment are not violated when voluntary consent is given to enter a residence and an arrest is effected based on probable cause. *People v. Simpson*, 172 Ill. 2d 117, 143-44, 665 N.E.2d 1228 (1996). "Consent to enter may be obtained from the defendant or a third party who possesses common

authority over the premises." *Simpson*, 172 Ill. 2d at 144. Common authority exists where there is "mutual use of the property by persons generally having joint access or control for most purposes." *United States v. Matlock*, 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7 (1974); *Simpson*, 172 Ill. 2d at 144. If the police are given consent to enter by one the police reasonably believes has authority to consent, warrantless entry is also valid. *Illinois v. Rodriguez*, 497 U.S. 177, 186, 111 L. Ed. 2d 148, 160, 110 S. Ct. 2793, 2800 (1990); *Simpson*, 172 Ill. 2d at 144.

■ In the present case, prior to trial defendant made a motion to quash the arrest and suppress his confession on the grounds that the warrantless arrest was unreasonable. The trial court denied the motion, finding that the detectives obtained consent from defendant's grandmother to enter the residence. When the detectives arrived at defendant's house, they knocked on the door and defendant's grandmother answered and told them who she was. Detectives inquired whether defendant was present, to which the grandmother answered "he's all the way in the back." It was reasonable for the detectives to believe that the grandmother had authority to consent when she gestured over her shoulder toward the back and allowed the detectives to enter. Her actions demonstrated that she generally had joint access or control for most purposes. Defendant and his cousin, Keona Scott, both testified that the rear apartment in which they resided was accessible from the front apartment through a door that led to a hallway and then to their door. Scott stated that police officers came to her door and she asked them to wait outside, but they came in right behind her. The testimony, however, from the State's and defendant's witnesses was contradictory. Detective O'Connor said that he did not have to be let in another door and he "was under the impression that it was all one residence since grandma walked [them] back to where [defendant] was." Furthermore, defendant admitted that from the street the building looks like a "two-flat." The trial court determined the credibility of the witnesses, weighed the testimony, resolved the conflicts in it, and found that the arrest was valid on the basis that entry was consensual. We agree and find that this ruling is not manifestly erroneous.

■ Next we turn to defendant's position that his confession should have been suppressed because the police lacked probable cause to arrest him. The State maintains that the trial court properly held that there was probable cause to arrest defendant after two of defendant's fellow gang members implicated him in the murders. A reviewing court's task is simply to ensure the trial court had a substantial basis for concluding probable cause existed. *People v. Adams*, 131 Ill. 2d 387,

400, 546 N.E.2d 561 (1989). Law enforcement officers have probable cause to make an arrest if at the moment of the arrest "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that" the suspect had committed an offense. *Beck v. Ohio*, 379 U.S. 89, 91, 13 L. Ed. 2d 142, 145, 85 S. Ct. 223, 225 (1964). Probable cause is based on a practical, commonsense consideration of the totality of facts and circumstances known to the officers at the time of the arrest. *Illinois v. Gates*, 462 U.S. 213, 76 L. Ed. 2d 527, 103 S. Ct. 2317 (1983); *People v. Jones*, 156 Ill. 2d 225, 620 N.E.2d 325 (1993). "[A]dmissions against penal interest may, by their very nature, possess inherent indicia of reliability." *People v. James*, 118 Ill. 2d 214, 223, 514 N.E.2d 998 (1987). Probable cause requires a probability of criminal activity, not proof beyond a reasonable doubt. *People v. House*, 141 Ill. 2d 323, 370, 566 N.E.2d 259 (1990).

■ In this case, the evidence at trial showed that the officers had probable cause to arrest defendant. The police reasonably believed that defendant was involved in the murders because they were told this information by two of defendant's fellow gang members, Gardner and Phillips, who stated that they were also involved. Gardner stated that he and three other members were assigned to be lookouts, while four other members, including defendant, went into Lassiter's apartment to collect money. Gardner recalled hearing gunshots, and shortly after, defendant and others came out and defendant yelled "almighty," meaning the job was completed. When shown a picture of defendant, Gardner identified him as C-Deon. Phillips told a story similar to Gardner's and additionally stated that defendant had shot the victims. Their statements had an inherent indicia of reliability as admissions against their own penal interests. First, they both indicated their own involvement, therefore enhancing the overall reliability of the statements. Second, the record does not indicate that their statements were given after any inducement or promise of leniency. Based on the officers' experience and commonsense consideration of the totality of facts and circumstances, they had probable cause to arrest defendant after receiving the information from Gardner and Phillips. Accordingly, we find the trial court properly denied the motion to quash defendant's arrest and suppress evidence.

■ With regard to defendant's contention that evidence of his gang membership unduly prejudiced him, the State maintains that defendant's membership in the Vice Lords gang was more probative than prejudicial because it established a motive for the shooting. Evidence is relevant where it tends to make the existence of any fact that is of consequence to the determination of the action more or less prob-

able than it would be without that evidence. *People v. Gonzalez*, 142 Ill. 2d 481, 489, 568 N.E.2d 864 (1991). For example, gang-related evidence may be relevant to show common purpose or design or a motive for an otherwise inexplicable act. *Gonzalez*, 142 Ill. 2d at 488. If the evidence is relevant, it may be admitted whether its probative value outweighs its prejudicial impact; a trial court's decision to admit such evidence will not be reversed absent a clear abuse of discretion. *Gonzalez*, 142 Ill. 2d at 489.

After a careful review of the record, we find that the gang affiliation of defendant was relevant to prove defendant's motive for murder. The evidence proved that defendant belonged to the Conservative Vice Lords gang. On November 16, 1992, Goldie called a meeting of the Traveling Vice Lords gang where Goldie said they were going to a man's apartment to collect money the man owed him for drugs. Goldie said if the man did not have the money, they would have to "take care of business." At the apartment, Goldie began arguing with Lassiter and ordered defendant to shoot him. Defendant admitted that he shot Lassiter in the head. We find that the gang-affiliation evidence between Goldie and defendant helped explain to the jury how and why defendant became involved in a dispute that was originally between Goldie and Lassiter. Thus, we conclude that the evidence was relevant and related to the crime charged.

■ Defendant also contends that the State's comments during rebuttal closing argument were improper. Specifically, the assistant State's Attorney stated:

"Ricardo Abreu started wearing a police uniform serving and protecting the People of the City of Chicago before Deon Patrick was born to this earth. And Detective Tony Villardita seventeen years ago when Deon Patrick was four or five years old. Four or five years before he joined the Vice Lords, again serving and protecting the People of the City of Chicago. Joe Magats['] career is somewhat shorter. He's only been a state's attorney for 5 years. His career as a prosecutor is about half the length of Deon Patrick's career as a Vice Lord. These are decent hard working competent people. *The police are the good guys. The Vice Lords are the bad guys. Let's start with that premise.* \*\*\*
\* \* \*

[Defendant has] been a Vice Lord since he was 9 years old. \*\*\* He's a Vice Lord for half his life. Since he was old enough—when most people are playing little league, he's in the Vice Lord. When other kids are riding bikes, he joins the Vice Lords. \*\*\* *And remember, the police are good, the Vice Lords are bad. And that's a fact.*" (Emphasis added.)

Courts allow prosecutors wide latitude during closing arguments, and

"the propriety of their comments is within the trial court's discretion." *People v. Sutton*, 260 Ill. App. 3d 949, 960, 631 N.E.2d 1326 (1994). "[I]mproper remarks generally do not constitute reversible error unless they result in substantial prejudice to the accused." *People v. Caballero*, 126 Ill. 2d 248, 273, 533 N.E.2d 1089 (1989). Such a remark caused the defendant substantial prejudice if it was a material factor in the conviction or if the jury might have reached a different verdict absent the remark. *People v. Flax*, 255 Ill. App. 3d 103, 109, 627 N.E.2d 359 (1993). In addition, the trial court is in a better position than a reviewing court to determine the prejudicial effect of any remarks made during closing argument, and, therefore, we will not disturb the trial court's determination absent a clear abuse of discretion. *People v. Pittman*, 126 Ill. App. 3d 586, 467 N.E.2d 918 (1984). A "voluntary confession by a competent person is the highest type of evidence known to the law." *People v. Rodriguez*, 275 Ill. App. 3d 274, 283, 655 N.E.2d 1022 (1995).

■ In a written statement, defendant admitted that he shot Lassiter in the head. Defendant's confession was also corroborated by Gardner and Phillips. Although we believe that the State's comments were erroneous and inappropriate, there is overwhelming evidence of defendant's guilt, including his voluntary confession. Furthermore, we find that even though the remark was improper, defendant has not shown that he suffered substantial prejudice or that the jury would have reached a different result absent the remark. *Flax*, 255 Ill. App. 3d at 109.

Still to be considered is defendant's argument that the State's impeachment of its own witness, Faye McCoy, and its use of that impeachment as substantive evidence deprived him of a fair trial. Initially, we note that defendant has waived this issue because he failed to object at trial and failed to allege the error in his posttrial motion, and we find that the plain error doctrine articulated in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) does not apply. *People v. Enoch*, 122 Ill. 2d 176, 186, 522 N.E.2d 1124 (1988).

■ Even assuming that defendant had not waived this argument, we find that although the State improperly impeached McCoy, the error was harmless. Supreme Court Rule 238(a) allows a party to impeach its own witness with a prior inconsistent statement. 134 Ill. 2d R. 238(a). "A court's witness, or any witness for that matter, cannot be impeached by prior inconsistent statements unless his testimony has damaged, rather than failed to support the position of the impeaching party." *People v. Weaver*, 92 Ill. 2d 545, 563, 442 N.E.2d 255 (1982). "An error is harmless where there is sufficient evidence establishing defendant's guilt beyond a reasonable doubt, and defen-

dant cannot show that the error was the basis for the jury's verdict." *People v. Chatmon*, 236 Ill. App. 3d 913, 930, 604 N.E.2d 399 (1992).

In this case, when McCoy viewed the lineup, she did not tell Detective Villardita that defendant was definitely not one of the four men who came out of the building. Detective Villardita said McCoy merely told him that she knew four of the people and identified defendant, Daniel Taylor, Rodney Matthews, and Paul Phillips. She said that she did not know their names but knew they were from the 910 W. Agatite area. She also told Detective Villardita that she was afraid and was not going to court. At trial, however, McCoy testified that she did not tell Detective Villardita that she had seen the four men in the 910 W. Agatite area and that she did not say that she was afraid and was not going to court, but only said she was afraid of courtrooms, police stations, and Goldie. She then definitively stated that defendant was not one of the four men whom she saw leave the building on the night in question. We find this testimony failed to support, rather than clearly damaged, the State's case and, therefore, McCoy was improperly impeached. We believe, however, that this error was harmless in light of the evidence against defendant, including his confession.

Defendant also contends that the alleged error was compounded when the State improperly argued McCoy's prior inconsistent statement as substantive evidence in closing argument and rebuttal closing argument with certain comments regarding McCoy's testimony, her credibility, and her fears. The State contends that every comment was proper comment on the evidence. First, as we have already found that the alleged error was harmless, there is no error to be compounded. Second, assuming there was an error here, we do not find that defendant has shown that he suffered substantial prejudice. *Flax*, 255 Ill. App. 3d at 109.

With respect to defendant's next assertion, that Detective Abreu's "deliberate" testimony that defendant was implicated by others constitutes reversible error, the State maintains that any prejudice this response may have caused would have been cured by the fact that the trial court immediately sustained defense counsel's objection and instructed the jury to disregard the question and answer. Prior to trial, defendant filed a motion *in limine* which in part sought to exclude statements made by codefendants implicating defendant. The trial court granted defendant's motion. During cross-examination of Detective Abreu, defense counsel asked "[a]fter Mr. Patrick was placed in that room did you ask him any questions about the homicide that occurred on November 16, 1992?" Detective Abreu responded, "[w]e informed him that he was named as one of the offenders in the double homicide."

■ An instruction to disregard evidence ordinarily cures error in its admission, particularly when the improper testimony is not directly responsive to the question and it is promptly stricken. *People v. Rice*, 234 Ill. App. 3d 12, 18, 599 N.E.2d 1253 (1992). Applying the law to the facts in the instant case, we find the circuit court did not err. Although Abreu's answer clearly went beyond the question asked, it was quickly stricken and the jury was instructed to disregard it, which cured any error. Moreover, the State could not have elicited or controlled Abreu's answer because it was in response to defense counsel's question. Therefore, we find that, based upon the overwhelming evidence of defendant's guilt, the limiting instruction, and the fact that Abreu's response was to defense counsel's question, defendant was not denied a fair trial.

■ Defendant also urges that the admission of evidence that Lassiter was beaten six days before the murder constitutes reversible error. Initially, we note that defendant did not preserve this issue on appeal because he failed to object to the alleged errors both at trial and in a written posttrial motion (*Enoch*, 122 Ill. 2d at 186), and the plain error doctrine articulated in Rule 615(a) is inapplicable to this case. We will, however, address this issue.

Evidence of crimes for which a defendant is not on trial is admissible if relevant for any purpose other than to show the propensity to commit crime, such as *modus operandi*, intent, identification, motive or absence of mistake. *People v. Tayborn*, 254 Ill. App. 3d 381, 388, 627 N.E.2d 8 (1993). In fact, our supreme court has held that evidence of other offenses is admissible if it is relevant for any purpose other than to show the propensity to commit a crime. *People v. Illgen*, 145 Ill. 2d 353, 365, 583 N.E.2d 515 (1991). The admissibility of evidence at trial is a matter within the sound discretion of the trial court and will not be reversed absent a clear abuse of discretion. *Illgen*, 145 Ill. 2d at 364.

In the present case, although the evidence did not indicate that defendant was involved in the prior beating of the victim, the evidence was necessary to explain the sequence of events that occurred to Lassiter. Lassiter owed Goldie money for drugs and Goldie said if Lassiter did not have the money, they would have to "take care of business." Garner described how one week before, Lassiter was beaten up and that his face was bloody. Officer Baxter said Lassiter told him that some of his partners had beaten him up. This evidence does not show defendant's propensity to commit a crime. Defendant was not implicated in the prior beating of Lassiter, and if anyone was suspected for the prior beating, it was Goldie. Furthermore, defendant probably did not know about the prior beating or Lassiter's drug debts until

Goldie told him about them at the gang meeting. Under the circumstances, we cannot say that the trial court abused its discretion.

Finally, defendant claims that the evidence was insufficient for the jury to find him guilty beyond a reasonable doubt. Initially, we note that compliance with Supreme Court Rule 341 (134 Ill. 2d R. 341) is of importance in every appeal. A point raised but not argued or supported by citation to authority fails to meet the requisites of Rule 341(e)(7) (134 Ill. 2d R. 341(e)(7)) and, therefore, may be deemed waived. *People v. Dinger*, 136 Ill. 2d 248, 254, 554 N.E.2d 1376 (1990). However, we decline to take such a severe action at this time and choose to discuss the merits of this issue.

The standard of review on a challenge to the sufficiency of the evidence in a criminal case is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Sutherland*, 155 Ill. 2d 1, 17, 610 N.E.2d 1 (1992). A reviewing court should apply this standard regardless of whether the evidence is direct or circumstantial and should not substitute its judgment for that of the finder of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Sutherland*, 155 Ill. 2d at 17. A trial court's determination as to the witnesses' credibility and the weight given to their testimony is entitled to great deference. *People v. Jones*, 174 Ill. App. 3d 737, 528 N.E.2d 1363 (1988). A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of a defendant's guilt. *People v. Byron*, 164 Ill. 2d 279, 299, 647 N.E.2d 946 (1995).

After carefully reviewing the record on appeal, we find that any rational trier of fact could have found defendant guilty beyond a reasonable doubt. In defendant's confession, he stated that he attended a gang meeting where Goldie said they were going to a man's apartment to collect money he owed Goldie for drugs and if the man did not have the money, Goldie said they would have to "take care of business." Defendant confessed to shooting Lassiter in the head. After he shot Lassiter, defendant claimed Goldie took the gun away from him and shot Haugabook. Defendant, however, argues that his confession was suspect because he was handcuffed to a ring on a wall the entire time at the police station and asked for permission to call his lawyer but was not allowed to do so. It is, however, the duty of the trier of fact, not of the reviewing court, to assess the credibility of witnesses. The trial court found the testimony of Detectives O'Connor and Abreu, which refuted defendant's testimony, credible. In addition, Officer Fournier, a firearms examiner, lent support to defendant's confession

that the victims were shot with the same gun when he opined that the bullets in both Lassiter's and Haugabook's bodies were fired from the same weapon. Furthermore, Gardner recalled hearing gunshots and then seeing defendant yelling "almighty," meaning the job was completed. Phillips then corroborated Gardner's statement when he stated that defendant had shot the victims. Thus, after viewing the evidence in the light most favorable to the State, we find that defendant was proved guilty beyond a reasonable doubt.

Finally, we note that defendant alleges there was cumulative error; however, we cannot agree.

In light of the foregoing, we affirm the judgment of the circuit court of Cook County.

Affirmed.

JUSTICE COUSINS, specially concurring:

I concur with the decision to affirm the judgment of the circuit court in this case. However, the prosecutor erred grossly during rebuttal argument by portraying the police as the "good guys" and the defendant as one of the "bad guys." Since silence can be regarded as condonation, this special concurrence is penned with reasons for disapprobation. The pertinent statements during rebuttal argument by the prosecutor (Mr. Needham), the defense attorney (Mr. Theis) and the court during rebuttal that occasion my special concurrence were as follows:

"MR. NEEDHAM: *** Think about what an evil, vile person would do that. Not just cut corners or fudge a police report or something to make your job a little bit easier. An out and out frame. What kind of person would do that. And then go to court two and a half years later and take an ought [sic] and run the risk of sending Mr. Innocent to an almost certain life in the penitentiary.

MR. THEIS: Judge—

MR. NEEDHAM: Or worse.

MR. THEIS: I'm going to object and ask for a sidebar.

THE COURT: Overruled.

MR. NEEDHAM: What kind of man would do something like that.
* * *

Ricardo Abreu started wearing a police uniform serving and protecting the People of the City of Chicago before Deon Patrick was born to this earth. *** [Joe Magats is a State's Attorney.] His career *** is about half the length of Deon Patrick's career as a Vice Lord.

These are decent hard working competent people. *The police are*

*the good guys. The Vice Lords are the bad guys. Let's start with that premise.* \*\*\* When other kids are riding bikes, he joins the Vice Lords. So, get this idea out of your head right now that he was some lost soul there in the police station surrounded by these evil police officers. *And remember, the police are good, the Vice Lords are bad. And that's a fact.*" (Emphasis added.)

The record in the instant case reflects that the aspects of the rebuttal argument about which the defendant complains were brought to the attention of the trial judge. See *People v. Young*, 128 Ill. 2d 1, 39, 538 N.E.2d 461 (1989). The prosecutor's argument was irrelevant and incorrect when he asserted: "And that's a fact." "[When] a prosecutor's statements in summation are not relevant to the defendant's guilt or innocence and can only serve to inflame the jury, the statements constitute error." *People v. Caballero*, 126 Ill. 2d 248, 271, 533 N.E.2d 1089 (1989), citing *People v. Tiller*, 94 Ill. 2d 303, 321 (1982); *People v. Smothers*, 55 Ill. 2d 172, 176, 302 N.E.2d 324 (1973). "The test for determining if the prosecutor's comments constitute reversible error is whether the remarks, considered in light of all the evidence, were a material factor in the conviction, or whether the jury might have reached a different result had the comments not been made." *People v. McCall*, 190 Ill. App. 3d 483, 493 (1980), citing *People v. Lasley*, 158 Ill. App. 3d 614, 625-26, 511 N.E.2d 661 (1987). Although the prosecutor's remarks constitute error, the improper remarks do not constitute reversible error because the evidence of defendant's guilt in the instant case is overwhelming. See *People v. Caballero*, 126 Ill. 2d 248, 273, 533 N.E.2d 1089 (1989).

Therefore, I specially concur.

McNULTY, P.J., joins in this special concurrence.