NOTICE

Decision filed 12/28/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190421-U

NO. 5-19-0421

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 17-CF-3263 |
| | ) | |
| KEVIN D. GARDNER, | ) | Honorable |
| | ) | Kyle Napp, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Moore concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's conviction and sentence are affirmed where the defendant failed to establish: (a) his first degree murder conviction should be reduced to second degree murder because the State failed to disprove the defendant's showing that he had an actual, though unreasonable, belief in the need to defend himself; (b) the trial court did not conduct a proper preliminary *Krankel* hearing; (c) possible neglect of trial counsel; and (d) the defendant's prison sentence for first degree murder was excessive. The defendant's conviction on the second count of first degree murder is vacated and remanded.

¶ 2    Following a jury trial, the defendant, Kevin D. Gardner, was convicted of first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) with an enhancement for having personally discharged the firearm that proximately caused the victim's death (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2016)), and was sentenced to 40 years' imprisonment on the first degree murder conviction and 40 years' imprisonment on the enhancement, to be served consecutively for a total of 80 years. On

1

appeal, the defendant argues: (a) his first degree murder charge should be reduced to second degree murder and the case remanded for resentencing; (b) the case should be remanded for a new preliminary *Krankel* hearing (see *People v. Krankel*, 102 Ill. 2d 181 (1984)) because the trial court failed to conduct an adequate inquiry into the defendant's claims of ineffective assistance of counsel in that it failed to inquire of defense counsel; (c) the case should be remanded for a new preliminary *Krankel* hearing and new counsel appointed because the defendant showed possible neglect on the part of trial counsel; (d) the defendant's aggregate 80-year prison sentence was excessive and the case should be remanded for resentencing; and (e) the defendant's conviction on count II for first degree murder should be vacated. For the following reasons, we affirm in part and remand in part.

¶ 3                                                    I. BACKGROUND

¶ 4                                                   A. The Information

¶ 5      On November 15, 2017, the defendant was charged, by information, with first degree murder, a Class M felony, in that he, without lawful justification, shot Robert L. Gilmore about the head, knowing such act created a strong probability of death or great bodily harm to Gilmore, thereby causing the death of Gilmore, in violation of section 9-1(a)(2) of the Criminal Code of 2012 (720 ILCS 5/9-1(a)(2) (West 2016)).

¶ 6                                                    B. Jury Trial

¶ 7      The jury trial commenced on March 4, 2019. During the trial, the evidence established that on November 13, 2017, the defendant shot and killed Gilmore, after leaving the Madison Meat Market in Madison, Illinois. The defendant does not dispute this finding.

¶ 8      The State called Lieutenant Jeff Bridick who worked for the Madison County Sheriff's Department and was also the city's fire chief. He testified that on November 13, 2017, while off-

2

duty, he heard four to six gunshots outside his home on 1607 Fourth Street in Madison, Illinois, around 7 o'clock in the evening. He went outside his home to try to discern from where the shots came and discovered a dark vehicle with tinted windows in a vacant lot by his house. Inside the vehicle was a man, later determined to be Gilmore, slumped over with what appeared to be blood coming from his mouth and ears. Bridick then contacted the Madison Police Department. He did not touch or move anything around or inside the vehicle. The police department quickly arrived on the scene and Bridick returned to his home.

¶ 9    Detective Kyle Graham of the Madison Police Department testified that at the time of the incident, he was a patrol officer. He was dispatched to the scene whereupon he observed a black Chevy Impala parked next to Bridick's home. The car had front end damage as it had struck another car before coming to rest. The Impala's windows were tinted such that he could not see inside until he was right up on the vehicle. Gilmore was inside, slumped over. Detective Graham and another officer tried to open the doors to obtain access but were unable to do so as they were locked. Detective Graham then used a window punch to gain access through the farthest back window on the driver's side. He was then able to open the back door and, thereafter, the driver's door. Once the driver's door was open, he observed thick blood coming from Gilmore's head and mouth. He did not feel a pulse on Gilmore. A crime scene perimeter was established. Detective Graham further testified there was a bullet hole in the rear passenger side window. In Gilmore's left hand was a cellphone. A .40 caliber firearm lay in the front passenger seat.

¶ 10    Illinois State Police crime scene investigator, Joshua Easton, testified he was called to the scene by the Madison Police Department to assist in processing a death investigation. He initially observed a black 2013 Impala in a vacant lot on the northeast corner of Fourth Street and Washington Street. It appeared the car had struck another vehicle parked near the intersection.

3

Upon approaching the vehicle, Investigator Easton observed Gilmore deceased, with a cell phone in his left hand. There was another phone in the passenger's seat, along with a .40 caliber firearm and a bag with what appeared to be liquor in it. The firearm's safety was off and there was an unfired bullet within. In the backseat, a 100-count box of .40 caliber ammunition was found. On the outside of the vehicle, Investigator Easton observed a bullet hole in the rear passenger door window that had shattered the glass and another hole on the front passenger door. He also observed bullet holes in the rear passenger door. He took photographs of the scene and collected swabs of a blood-like substance on the driver's side mirror area and the driver's side exterior. Investigator Easton also collected six 9 millimeter shell casings in the yard located at 1522 Fourth Street. The next day he photographed and processed the Impala at the Metro East Forensic Laboratory. Investigator Easton collected fired projectile fragments from the rear passenger door frame as well as from inside the front passenger door.

¶ 11    The parties stipulated, in lieu of testimony, that Detective Mike Lane obtained a true and accurate copy of the surveillance video taken the night of the murder from the Madison Meat Market located at 308 Madison Avenue in Madison, Illinois. They further stipulated Detective Keith Jackson obtained a true and accurate copy of the video footage from the night of the murder from a building located at 1548 Fourth Street. This footage showed the area of the corner of Fourth Street and Washington Avenue.

¶ 12    Lieutenant Dave Vucich of the Madison County Sheriff's Office testified that he reviewed the aforesaid surveillance footage. The footage showed a gray Dodge Magnum arrive at the store around 6:50 p.m. He identified the vehicle occupants as Eric Mason, Dominick Harris, and the defendant. In the defendant's back pocket was what appeared to be an ammunition magazine. At 6:54 p.m., Gilmore arrived at the store in a black Chevrolet Impala and thereafter entered the store.

Gilmore is seen moving a handgun from his ankle to the waistband of his pants. While in the parking lot, the gun fell out of Gilmore's pants which he then picked up. At 6:55 p.m., the Dodge Magnum is seen leaving the parking lot. At 6:58 p.m., an individual is faintly seen coming out of the alley on Fourth Street. Gilmore left the store around 7 p.m. At 7:02 p.m., a blurry image of an individual is seen at a carport, also on Fourth Street. At 7:03 p.m., Gilmore left the market in the Impala. Within seconds, Gilmore's vehicle slid into a vacant lot.

¶ 13    Dr. Gershom Norfleet, a forensic pathologist, testified he performed the autopsy on Gilmore on November 14, 2017. He found Gilmore had a gunshot wound to the right temple and his blood alcohol content was .217 milligrams per deciliter.

¶ 14    Eric Mason testified he was currently serving an eight-year prison sentence for obstruction of justice related to Gilmore's killing and was originally charged with murder. He stated that he picked up the defendant and Dominick Harris in his silver Dodge Magnum the evening of the shooting. They ended up at the Madison Meat Market. He saw the defendant show a handgun and a firearm magazine to another acquaintance while in the store. After they left the store and talked a few minutes, a black car pulled into the parking lot. The defendant pointed at the man in the car and said "that little dude right there." As soon as the car pulled up, at the defendant's urging, they left in the Dodge Magnum. They traveled down Fourth Street, back up Third Street, down Washington Avenue, made a U-turn in the market's parking lot, then drove back up Fourth Street to Mason's girlfriend's grandmother's residence. The defendant told Mason, in reference to Gilmore, "I gotta get dude up outta here before he get me up outta here." The defendant then exited the car, saying he was going to a relative's house. Roughly 10 minutes later, Mason heard gunshots and saw a black Impala drive past slowly and then crash into another vehicle. At that time, he and Harris drove off and the defendant jumped back into his vehicle a short distance later. The

5

defendant said "you all ain't heard nothing, you all ain't seen nothing." Mason then dropped the defendant and Harris off in Venice, Illinois.

¶ 15    Harris testified similarly to Mason. While at the Madison Meat Market, when Gilmore's car entered the lot, the defendant wanted to leave immediately. When he and Mason later left the house on Fourth Street, he saw the defendant running. The defendant then jumped back into the vehicle and stated, "Did you all hear them shots?" and "You ain't heard s***." Harris was incarcerated at the time of trial pursuant to a plea agreement.

¶ 16    Sergeant Jeremy Hunter, of the Granite City Police Department and a member of the Major Case Squad of Greater St. Louis, testified that after gathering and speaking to witnesses and reviewing video footage, the focus of the investigation became locating and interviewing the defendant. The Squad was activated to find the defendant but disbanded after five days. The U.S. Marshals continued the search and apprehended the defendant on November 18, 2017, two weeks after the homicide. Sergeant Hunter was assigned to interview the defendant. The November 18, 2017, interview lasted about an hour and 15 minutes. The defendant was very defiant. All statements were audio and video recorded. The focus of the interview was why, not if, the defendant had shot Gilmore as Sergeant Hunter had already determined through the investigation that the defendant was the perpetrator. The defendant denied being the shooter, having a handgun, or knowing Gilmore. Sergeant Hunter asked the defendant if he was defending himself when he shot Gilmore, but the defendant continued to deny knowing Gilmore or having a gun. At no other point did the defendant indicate the shooting was in self-defense, although Sergeant Hunter gave him numerous opportunities to do so.

¶ 17    On the fourth day of trial, the defendant announced his intention to testify to another pending charge (separate from the murder charge) stemming from a shooting on June 4, 2017, in

6

which he was charged with aggravated discharge of a firearm. The trial court discussed this with the defendant as follows:

"THE COURT: It is my understanding that Mr. Gardner is choosing to testify and he wants to bring out the incident that occurred on June 4, 2017, where he is charged with Aggravated Discharge of a Firearm and he is wanting to bring out that information about that shooting because he believes it would help in his defense in this case. Is that what I am understanding, Mr. Fuller?

MR. FULLER: That is correct, Your Honor.

THE COURT: Mr. Gardner, do you understand that the Court had previously said absolutely the jury is not to know about these pending charges against you?

DEFENDANT GARDNER: Yes.

THE COURT: Mr. Gardner, do you understand that if you take the stand and bring that out yourself, the State would be allowed to question you about that?

DEFENDANT GARDNER: Yes.

THE COURT: And that you would then be admitting to a jury that you were involved in a conflict that involved a firearm?

DEFENDANT GARDNER: Yes.

THE COURT: And your attorney advised you that he doesn't think this is a good idea, right?

DEFENDANT GARDNER: Yes.

THE COURT: And even though he's advising you that he doesn't think this is a good idea and that you shouldn't do this, this is something that you are deciding that you want to do?

7

DEFENDANT GARDNER: Yes.

THE COURT: If you take the stand, Mr. Gardner—and we talked about this yesterday afternoon and I asked you all the questions I needed to ask you—if you take the stand and you elicit information about a prior shooting the State would be allowed to question you about that. Do you understand that?

DEFENDANT GARDNER: Yes."

¶ 18 Also on the fourth day of trial, the defendant set forth his intention to call Detective Michael Renth of the Madison Police Department to testify about his familiarity with the defendant, Gilmore, and the defendant's cousin, Zayren Gregory, through his employment as a police officer. The defendant believed Detective Renth's testimony could help establish his theory of self-defense. The defendant also wished to bring out information from Detective Renth regarding the shooting incident on June 4, 2017. The trial court discussed this issue with the defendant:

"THE COURT: Sure. Agreed. So I still haven't resolved my issue with regard to Officer Renth, and I need to get this going. We've got a jury that's been waiting now a half hour. So, Officer Renth, we talked about it back in chambers briefly, but you would call Officer Renth to testify about his investigation of the shooting in this Aggravated Discharge of a Firearm case that I just discussed with your client; is that right, Mr. Fuller?

MR. FULLER: That's correct, Your Honor.

THE COURT: If that's the strategy you guys wish to go with then I'm not going to stop it.

MR. FULLER: I'd reiterate, Your Honor, that I discussed this at length with Mr. Gardner, I have advised him what my thoughts are and I think the Court

8

accurately set forth my position on it. Mr. Gardner has been insistent about this for some time, and despite my—we're at an impasse on that as far as—"

¶ 19    The defendant then called Detective Renth to testify. Detective Renth testified that on June 4, 2017, a shooting occurred in which the defendant was involved and was shot in the leg. The defendant went to the hospital where he gave a false name and then fled before authorities arrived. At least two other individuals were shot, including an innocent bystander. The defendant was charged with unlawful possession of a firearm by a felon (720 ILCS 5/24-1.1(a) (West 2016)) and aggravated unlawful discharge of a firearm (*id.* § 24-1.2(a)(2)) in connection with the incident. Gilmore's name was never mentioned in the course of Detective Renth's testimony.

¶ 20    Denzel McNeil, the defendant's cousin, testified he and the defendant were driving in Madison, Illinois, on September 25, 2017, when Gilmore cut them off with his car. When they subsequently got to a gas station, Gilmore displayed a gun. Neither McNeil nor the defendant called the police. Before the incident, McNeil had never seen Gilmore. He identified Gilmore via a photo shown to him by the defendant's investigator.

¶ 21    John Richardson, the defendant's special investigator, testified he spoke with McNeil as well as the defendant. He showed photographs to McNeil of Gilmore. McNeil identified Gilmore as the person who had pulled a gun on him and the defendant on September 25, 2017, though he did not identify Gilmore by name.

¶ 22    The defendant then testified on his own behalf. He testified he had prior convictions for armed robbery, retail theft, and mob action. The defendant testified he had taken responsibility for his actions in those cases. He also had pending charges at the time of trial as set forth in Detective Renth's prior testimony. He stated he lied in his interview with Sergeant Hunter because he was scared and feared for his life. The defendant and Gilmore had a business relationship in which

9

Gilmore sold drugs to the defendant who then sold them to others. Gilmore owed the defendant $1300, which the defendant had attempted to collect but ceased doing so after Gilmore pulled the gun on him during the gas station incident with McNeil. The defendant next testified about the June 4, 2017, incident. He and his cousin, Frank Brown, had gone to the Phillips 66 gas station. He went in and purchased alcohol. Upon exiting the store and approaching his vehicle, shots were fired at him and Brown by three individuals. The defendant was hit in the leg and Brown was hit in the back and leg. He shot back, which resulted in criminal charges against him. Gilmore was not part of the shooting. After the shooting ceased, he left the scene and went to the hospital. He gave a fake name at the hospital because there were warrants for his arrest. The defendant's cousin, Zayren Gregory, had been shot a few days before this incident. Defense counsel did not ask the defendant if he thought Gilmore shot Gregory.

¶ 23 Turning to the incident now before the court, the defendant testified that, on November 13, 2017, he was at the Madison Meat Market and he had a firearm. After exiting the store, a black Impala pulled into the parking lot and he knew it was Gilmore. The defendant did not want a confrontation, so he had Mason take him to his cousin Rochelle's house on Fourth Street. He was the grainy image in the carport shown on the surveillance camera. He went to the back of the house to look for a key to get into the residence. He then called Mason to pick him up and went to the front porch to wait for him. As he was leaving the porch to try to get back to Mason's car, which was parked across a neighbor's yard, he observed Gilmore's car driving toward him. As Gilmore approached, the defendant saw what appeared to be a firearm in Gilmore's hand. When he saw the firearm, he thought Gilmore was going to kill him. He had only a few seconds to make a decision and, out of fear for his life, he fired shots at Gilmore's Impala. He had no intent to kill anybody and did not know if any of the bullets struck Gilmore. He then got back into Mason's car and fled

10

to Venice. He did not contact 911 because he did not want to go to jail. After the shooting, he hid from the police. He now regretted his actions on that night.

¶ 24 The trial court gave the jury instructions for first degree murder, second degree murder, and self-defense. The jury found the defendant guilty of first degree murder and found he had personally discharged the firearm that caused Gilmore's death.

¶ 25                                        Posttrial

¶ 26 On March 25, 2019, the defendant, *pro se*, filed a posttrial motion, raising several claims of ineffective assistance of counsel. In the motion, the defendant alleged defense counsel was ineffective because he failed to: (1) bring out testimony from Detective Renth linking Gilmore to the shooting incident in which the defendant's cousin Zayren Gregory was shot, and the shooting incident at Charlie's gas station in which the defendant was shot; (2) conduct proper *voir dire*; (3) present the self-defense theory; (4) object to other crimes evidence; (5) disclose a conflict of interest; (6) argue self-defense in his closing argument; and (7) request self-defense and second degree murder instructions.

¶ 27 On April 25, 2019, the trial court conducted a preliminary *Krankel* inquiry. The court began by explaining the procedure:

"THE COURT: So, Mr. Gardner, I read your motion—you title it Motion for Post-Trial Motions, and I read through your motion and under the law if the Defendant makes a written motion—an oral motion or a written it's supposed to be in writing, but lately the Courts have allowed oral motions as well. If the Defendant makes allegations, either in writing or orally, alleging ineffective assistance of counsel then it is incumbent upon the Court to inquire directly with you the bases of your claims and what your claims are. I would cite to *People v. Ayres*, A-Y-R-

11

E-S, which is 2017 IL 120071, which indicates that it's up to the Court to make this inquiry between the Court and Mr. Gardner, and I can also inquire of Mr. Fuller during this, it's called a preliminary *Krankel* hearing, and basically it's where the Court inquires of you what your allegations are. I also talk with defense counsel, the State is not allowed to contribute anything to this hearing. They aren't allowed to ask any questions or make any statements, they are allowed to be present and that's it.

And then I'll inquire as to what the bases of your claims are, then I'll determine whether or not there's any bases to your claims or if they stem to something else. Trial strategy, for instance.

So I'm going to talk to you now about your claims. You have a copy of your motion in front of you, so I would ask you, Mr. Gardner, if you like—I read it but you are more than welcome to elaborate on your motion, your written motion, if you wish, or to discuss it with the Court, you are welcome to do that and I'll let you do that now before I ask any questions, sir."

¶ 28    The following exchange occurred regarding the defendant's allegation related to Detective Renth's testimony:

"THE COURT: But he did put on Detective Renth.

DEFENDANT GARDNER: He put him on but as far as when I got shot. I was like—I don't really know how to really word it, but—

THE COURT: Let's be clear. I remember Mr. Fuller—there was discussion and it was on the record. There was information that you were bringing out that the Court had said I wouldn't allow it to be brought out because I thought it—the law

12

said that it wouldn't come out. The way I read the law is that it would be detrimental to you and that it shouldn't be allowed because it didn't have relevance to this particular case, but you specifically wanted it to be brought out, and Mr. Fuller put on the record that he spoke with you about that, that he advised you that he didn't think it was a good idea, but that you had a reason[ing] for why you wanted it to be brought out. And he brought out all of that information, which is what you had wanted to bring out based on our conversations in court.

And I would note the State—the only question really asked on cross that I recall was that the victim in this case, the deceased in the case at hand, wasn't a part of that shooting at Charlie's gas station, he was not involved, he wasn't there that day, that it was two separate people. That was the only question that the State brought out through Detective Renth. But you felt it was important to bring out this information, possibly for reasons that we talked about. But what more did you want Mr. Fuller to bring out that he didn't bring out that day with regard to Detective Renth?

DEFENDANT GARDNER: That it was a possibility linking, like we had discussed, like it was a possibility linking to Mr. Gilmore, that ambush of me arriving at that gas station, like—

THE COURT: How were you going to—how are you linking that incident that we just talked about to Robert Gilmore?

DEFENDANT GARDNER: Because prior to that day, which would be May 31st, that would be the same date that Zayren Gregory was shot, and in the police report it says clearly that upon arriving on the scene of this Zayren Gregory

13

shooting there was a black sports-type model vehicle which was identified by one of Madison police and the same black sports model vehicle that was in my case is the same vehicle that was in the Zayren case, it was May 31st and I was shot June 4th."

¶ 29    The court determined Detective Renth was never going to testify to what the defendant wanted because he already testified that Gilmore was not involved in the prior shootings. The court also noted, and the defendant agreed, that the defendant had the opportunity to link Gilmore to the previous shootings during his own testimony but failed to do so.

¶ 30    The court next inquired about the defendant's allegations regarding the jury *voir dire*. After the court asked the defendant to be more specific about these allegations, the defendant stated, "The age limit and the race, the jury was like—to me it didn't seem right—like it didn't seem right from the beginning." The court explained that no attorney, including the defendant's, can dismiss a juror based on age or race.

¶ 31    After the court inquired into the defendant's claim that counsel failed to present the defense theory properly, the defendant stated, "I believe the argument could have been a little more different than what it was as far as the evidence that was in the case as far as the victim, the previous altercations we had—me and the victim—and I think we won a motion where me and Mr. Gilmore, that it wasn't supposed to be brought up that we were selling drugs as far as what our business relation, and it was brought up when the State brought it up and questioned me when I was on the stand and they asked me which did I sell." The court then explained counsel was not ineffective for failing to object because the court previously ruled the State could bring out such information if the defendant testified to his prior "business" dealings with Gilmore.

14

¶ 32   Regarding the defendant's allegation that defense counsel failed to argue self-defense, the court explained that it had allowed the defense to put on its theory of self-defense and second degree murder. It further pointed out that defense counsel had, in fact, argued self-defense.

¶ 33   With regard to the allegation that counsel had a conflict of interest because he previously had been married to the assistant state's attorney, the court explained that the defendant had waived the perceived conflict during a pretrial hearing in which the court gave the defendant himself the opportunity to object.

¶ 34   After the court explained to the defendant that it did not believe defense counsel was ineffective for failing to object to other crimes evidence because the court ruled such evidence would come in if the defendant testified about those other crimes, the defendant stated that he had nothing further to argue on that contention of ineffectiveness.

¶ 35   The court then rejected the defendant's claim of ineffectiveness based on counsel's failure to request self-defense and second degree murder instructions. The court specifically recalled counsel arguing such during his closing argument and requesting those instructions, which were then tendered to the jury. In response to the court's question whether the defendant had any further allegations of ineffectiveness, the defendant replied, "At this time I can't think of nothin."

¶ 36   The following exchange then took place:

"THE COURT: So, I don't even need to talk to Mr. Fuller. I'm allowed to asked you questions if I wish, but I don't need to ask him any questions. I've read through your motion, I talked about it with you, Mr. Gardner, I sat through this entire trial with you. Your attorney asked all of the questions that as a judge sitting here I would think, I wonder if he'll ask about this, he should ask about this, it's just something we do, and he asked all of the questions. He asked the

15

right questions, sometimes he knew not to ask a question. That's all trial strategy, and sometimes trial strategy you look brilliant if it works out, and then everyone questions it if it doesn't, but that's part of trial strategy.

In this particular case the issue came up that really was the big issue was you wanting to bring in this other offense where you shot at people and got charged with that, and you also got shot, and Mr. Fuller thought that was a bad idea and he told you that, and it was put on the record and I talked to you about it, but ultimately that decision was yours, and you did it.

DEFENDANT GARDNER: When I was shot they watched the video, I shot back in self-defense.

THE COURT: What video? The video from the gas station shooting?

DEFENDANT GARDNER: Yes.

THE COURT: But that wasn't a part of this, that's a whole separate case. That was your bases for why you felt the way you felt about Mr. Gilmore and why you felt scared that night, and I allowed you to get into that other incident. I wouldn't allow the State to get into it, but I allowed you to get into it if you wanted to because that was your theory of why you were scared that night. But Mr. Fuller talked to you extensively about the good and bad of doing that. He explained it to you, and I think Mr. Fuller did a really good job representing you. Unfortunately a jury convicted you, but that doesn't change the fact the Mr. Fuller did everything that you would want a defense attorney to do. He spent a lot of time with you talking about this case. He called witnesses in his case-in-chief that he didn't have to but he did. He called in Renth because that's what

16

you wanted, and ultimately the decision is Mr. Fuller's on how to proceed, but it was after much conversation with you that he made certain decisions. He's a more than competent attorney, more than effective attorney, but sometimes facts are facts and he can't change the facts of the case, you know? He only has so much that he can do.

I do not find based on our conversation, based on my recollection of this trial and what occurred, I do not find that Mr. Fuller was in any way ineffective in your case. I don't think there's a factual basis for your claims of ineffective assistance of counsel. I went through each point with you and I talked to you and gave you an opportunity to let me know what else is out there, and there's nothing.

I don't find that there's a factual basis for your ineffective assistance claim and I am—for the purposes of this hearing—for the *Krankel* hearing—I am not finding that there is any ineffective assistance of counsel and I am not allowing Mr. Fuller to withdraw from your case, because the only basis under which it was filed it was based on your written ineffective assistance claim. There wasn't any other reason, so I'm not allowing Mr. Fuller to withdraw, I'm not finding that there was ineffective assistance of counsel, and I am going to proceed with the post-trial motions and sentencing hearing, if necessary. It's already set and it's currently set on a date, I believe—***."

¶ 37    Trial counsel filed a motion for a new trial, which was denied. On May 29, 2019, the trial court found no mitigating factors and sentenced the defendant to two consecutive 40-year

17

sentences in the Illinois Department of Corrections, one for first degree murder and the other for the mandatory firearm enhancement. The defendant appeals.

¶ 38                                    II. ANALYSIS

¶ 39    On appeal, the defendant argues: (a) his conviction for first degree murder should be reduced to second degree murder; (b) the trial court did not conduct a proper preliminary *Krankel* hearing; (c) he showed possible neglect of trial counsel and should have had new counsel appointed for his ineffectiveness assistance of counsel claims; (d) his sentence of 80 years' imprisonment was excessive; and (e) his conviction on count II of the first degree murder charge should be vacated under the one-act, one-crime doctrine. We will address each issue in turn.

¶ 40                              A. Imperfect Self-Defense

¶ 41    The defendant's first issue on appeal is whether his first degree murder charge should be reduced to second degree murder and the case remanded for resentencing. When a defendant argues on appeal that his first degree murder conviction should be reduced to second degree murder, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996); see *People v. Lee*, 213 Ill. 2d 218, 225 (2004).

¶ 42    "The elements of self-defense are: (1) that unlawful force was threatened against a person; (2) that the person threatened was not the aggressor; (3) that the danger of harm was imminent; (4) that the use of force was necessary; (5) that the person threatened actually and subjectively believed a danger existed that required the use of the force applied; and (6) the beliefs of the person threatened were objectively reasonable." *Lee*, 213 Ill. 2d at 225; *People v. Jeffries*, 164 Ill. 2d 104, 127-28 (1995). "The imperfect self-defense form of second degree murder occurs when there is

18

sufficient evidence that the defendant believed he was acting in self-defense, but that belief is objectively unreasonable." *Jeffries*, 164 Ill. 2d at 113.

¶ 43    "[T]he reasonableness of defendant's belief that the circumstances warranted the use of deadly force" involves credibility determinations that should be made by the jury. *Lee*, 213 Ill. 2d at 225. "It is the function of the jury as the trier of fact to assess the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence." *Id.* "The jury must also resolve conflicts or inconsistencies in the evidence." *Id.*

¶ 44    The defendant posits the shooting of Gilmore resulted from his belief, albeit objectively unreasonable, in the need for self-defense. The defendant testified he became fearful for his life when he spotted Gilmore coming towards him in his car while Gilmore was holding what appeared to be a gun in his hand. The defendant stated he had prior "business" dealings with Gilmore and there was "bad blood" between them. He further stated there had been an incident wherein Gilmore flashed a firearm at him. He avers all of these factors led him to believe he was in danger of death or great bodily harm at the hands of Gilmore. The defendant argues he left the market as soon as he saw Gilmore's car enter the parking lot because he feared Gilmore and did not want a confrontation with him.

¶ 45    The defendant contends he proved by a preponderance of the evidence the mitigating factor of self-defense. He further argues that upon this showing, the burden then shifted to the State to disprove the existence of the mitigating factor beyond a reasonable doubt. He avers the State did not meet its burden. We disagree.

¶ 46    Contrary to the defendant's claim, the State's evidence showed that after he and his friends left the Madison Meat Market, they did not leave the area. Rather, they traveled down the road and back again by the market and even made a U-turn in the store's parking lot, all while Gilmore

19

remained at the market. Moreover, the defendant's testimony wholly contradicted his first statements to Sergeant Hunter wherein he adamantly denied knowing Gilmore, having a gun, or shooting Gilmore. Of key importance, the defendant never asserted to Sergeant Hunter that he was defending himself although he was given the opportunity to do so.

¶ 47　　In this case, there was a plethora of evidence presented to the trier of fact. The jury was in the best position to discern and weigh the facts, and determine the credibility of witnesses and other evidence before it. *People v. Frazier*, 248 Ill. App. 3d 6, 13 (1993). The jury simply chose to believe the State's rendering of events in the shooting of Gilmore. In light of the foregoing, the trier of fact could have found beyond a reasonable doubt that the mitigating factor of self-defense was not present.

¶ 48　　　　　　　　　B. Preliminary *Krankel* Hearing

¶ 49　　The defendant next posits the trial court did not conduct a proper preliminary *Krankel* hearing. The issue of whether the trial court properly conducted a preliminary *Krankel* inquiry presents a legal question we review *de novo*. *People v. Roddis*, 2020 IL 124532, ¶ 33.

¶ 50　　As the defendant properly states, once a defendant makes a posttrial claim of ineffective assistance of counsel, the trial court must conduct a preliminary inquiry and examine the underlying factual matters. *People v. Krankel*, 102 Ill. 2d 181, 189 (1984); *People v. Ayres*, 2017 IL 120071, ¶ 9. "[A] *pro se* defendant is not required to do any more than bring his or her claim" during the preliminary *Krankel* inquiry. *Ayres*, 2017 IL 120071, ¶ 11; *People v. Jackson*, 2020 IL 124112, ¶ 96. The trial court may consider both the facts and legal merits of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel at the preliminary stage. *People v. Roddis*, 2020 IL 124352, ¶ 70. If the claim lacks merit or pertains only to matters of trial strategy, new counsel need not be appointed. *Id*. ¶ 35. If possible neglect is shown, the trial court should appoint

20

new counsel to represent a defendant at the hearing on the ineffective assistance of counsel claim. *Id.*; *People v. Moore*, 207 Ill. 2d 68, 77 (2003).

¶ 51    In the case now before this court, the defendant raised *pro se* posttrial claims of ineffective assistance of counsel and the trial court rightly conducted a preliminary *Krankel* hearing. However, the defendant would like us to find the preliminary hearing was deficient. We decline to do so.

¶ 52    Three factors are to be considered when determining whether a *Krankel* inquiry is sufficient: (1) whether there was some interchange between the trial court and defense counsel regarding the facts and circumstances surrounding the allegedly ineffective representation, (2) the sufficiency of defendant's *pro se* allegations of ineffective assistance, and (3) the trial court's knowledge of defense counsel's performance at trial and the sufficiency of the defendant's allegations on their face. *Moore*, 207 Ill. 2d at 78-79. Although these factors are to be considered, "[n]one of these factors are mandatory, and no bright-line rule exists about what is a sufficient inquiry and what is not." *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 71.

¶ 53    There is no question the trial court did not question defense counsel. However, the absence of such an interchange alone does not determine the sufficiency of the preliminary *Krankel* hearing. *Id.*

¶ 54    As the *Roddis* court observed:

"The trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims. We decline to unduly limit the most effective arbiter between patently frivolous claims and those showing possible neglect. The court can 'base its evaluation of the defendant's *pro se* allegations of ineffective assistance on its knowledge of defense counsel's performance at trial and the insufficiency of the

21

defendant's allegations on their face.' " *Roddis*, 2020 IL 124352, ¶ 56 (quoting

*Moore*, 207 Ill. 2d at 79).

¶ 55    In the case before this court, we need only look at the lengthy colloquy between the trial court and the defendant to determine the preliminary *Krankel* hearing was proper. At the outset, the trial court instructed the defendant as to what the hearing was about and the process that would be followed. The court went allegation by allegation with the defendant, asked clarifying questions, and gave explanations for its reasoning on each allegation. The court provided the defendant with the opportunity to develop further his arguments and raise any other argument. The court had a wealth of firsthand experience with the case, from the early stages through the trial and recalled many of the details. The court was also able to observe trial counsel's performance throughout the case.

¶ 56    The defendant also avers the trial court was argumentative with him at this hearing. We do not find this to be the case. While the defendant may not have received the desired feedback, the court was merely exploring the issues the defendant raised and, while doing so, stating the facts.

¶ 57    For the foregoing reasons, we find the trial court conducted a proper preliminary *Krankel* hearing.

¶ 58                                  C. Possible Neglect

¶ 59    The defendant also argues that he showed possible neglect on the part of trial counsel. "[W]hen a trial court has properly conducted a *Krankel* hearing, this court will review the trial court's determination that a defendant's claim does not demonstrate a possible neglect of the case by asking if that decision is manifestly erroneous." *People v. Lawson*, 2019 IL App (4th) 180452, ¶ 43. A decision is manifestly erroneous "when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98.

22

¶ 60 In the case now before us, the defendant first argues that trial counsel was ineffective because he failed to elicit testimony from Detective Renth linking Gilmore to the shooting of defendant's cousin a few days before this incident and the shooting of defendant at Charlie's gas station. We do not agree. The record reflects that defense counsel indeed questioned Detective Renth at the defendant's insistence. Detective Renth simply was not going to say what the defendant wanted him to say about those shootings.

¶ 61 The defendant further argues that trial counsel was ineffective because he did not conduct proper *voir dire* resulting in an unfair jury. Again, we disagree. The record is clear that no attorney, including trial counsel, has the power to dismiss a juror based on age or race, which is what the defendant requested.

¶ 62 The defendant next avers that trial counsel was ineffective because he did not object to the State raising the nature of the "business" dealings between the defendant and Gilmore during the defendant's testimony. Once again, we reject the defendant's argument. The record reflects that the court previously ruled the State could delve further into details if the defendant chose to testify about his "business" relationship with Gilmore.

¶ 63 The defendant further avers that trial counsel was ineffective because he failed to present a theory of self-defense. Again, the record does not support this argument and, to the contrary, reveals defense counsel argued self-defense on the defendant's behalf.

¶ 64 The defendant's allegation that trial counsel was ineffective due to a conflict of interest because counsel had previously been married to the prosecutor is without merit. The record is clear that the trial court gave the defendant an opportunity to object to the perceived conflict at a pretrial hearing and the defendant willingly chose to continue with trial counsel's representation.

23

¶ 65     Also without merit is the defendant's contention that trial counsel was ineffective for failing to object to other crimes evidence. The record reflects the trial court ruled such evidence would be allowed if the defendant raised the other crimes evidence during his testimony.

¶ 66     The defendant argues that trial counsel was ineffective because he failed to request jury instructions of self-defense and second degree murder. We reject this argument as well. The record is clear that trial counsel argued self-defense and second degree murder in his closing argument, and requested those instructions be tendered to the jury. Those instructions were, in fact, given.

¶ 67     As previously stated, the trial court had a wealth of firsthand experience with the case, recalled many details, and was able to observe trial counsel's performance throughout the case. We do not find the trial court's decision to be manifestly erroneous as the opposite conclusion is not clearly evident. The record is clear that there was no showing of neglect on the part of trial counsel that warranted appointment of new counsel.

¶ 68                                    D. Sentence

¶ 69     The defendant next argues the trial court's imposition of an aggregate 80-year sentence of imprisonment for the offense of first degree murder is excessive and constitutes an abuse of discretion, considering the mitigating factors of the defendant's relatively young age, his nonviolent criminal history, and his rehabilitative potential.

¶ 70     A trial court's sentencing decision is reviewed under an abuse of discretion standard. *People v. Abdelhadi*, 2012 IL App (2d) 111053, ¶ 8. Reviewing courts normally apply a strong presumption that the trial court based its sentencing decision on proper legal reasoning and give the decision great deference. *Id*. "[T]he presumption is overcome only by an affirmative showing that the sentence imposed varies greatly from the purpose and spirit of the law or manifestly violates constitutional guidelines." *Id*.

24

¶ 71    Sentences are to "be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "In sentencing a defendant, the trial court must consider the character and circumstances of the offense itself and the defendant's character, criminal history, mentality, social environments, habits, age, future dangerousness, and potential for rehabilitation. *People v. McGowan*, 2013 IL App (2d) 111083, ¶ 11. "Of all these factors, the seriousness of the offense has been called the most important." *Id.* " 'A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense.' " *People v. Spicer*, 379 Ill. App. 3d 441, 465 (2007) (quoting *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007))

¶ 72    At sentencing, the defendant asked the court to find factors in mitigation pursuant to sections 5-5-3.1(a)(3) ("[t]he defendant acted under a strong provocation"), 5-5-3.1(a)(4) ("[t]here were substantial grounds tending to excuse or justify the defendant's criminal conduct, though failing to establish a defense"), and 5-5-3.1(a)(5) ("[t]he defendant's criminal conduct was induced or facilitated by someone other than the defendant") of the Unified Code of Corrections (730 ILCS 5/5-5-3.1(a)(3), (a)(4), (a)(5) (West 2018)). The court declined and found no statutory mitigatory factors. In aggravation, however, it found the defendant had a history of prior delinquency or criminal activity (*id.* § 5-5-3.2(a)(3)) and the sentence was necessary to deter others from committing the same crime (*id.* § 5-5-3.2(a)(7)).

¶ 73    Although the trial court did not specifically mention age in its considerations, "[t]here is no mandatory requirement that the trial judge recite all" the aggravating and mitigating factors "before imposing sentence." *Jackson*, 375 Ill. App. 3d at 802. "It is presumed that the trial judge considered all of the factors unless the record indicates to the contrary." *Id.*

25

¶ 74    In the case now before us, the trial court affirmatively stated, "I have considered the factors in aggravation and mitigation as I am required by law to do so." It continued, "I have listened to the evidence adduced at trial. I have considered the presentence investigation that was supplied to the Court. I have considered the history, character and attitude of Mr. Gardner. I considered the financial impact of incarceration in this matter. I have listened to the evidence in aggravation and mitigation and the arguments of counsel." The record does not indicate the trial court failed to consider any statutory mitigating factors in its sentencing of the defendant.

¶ 75    As to the defendant's rehabilitative potential, "[t]he command of the Illinois Constitution to consider the rehabilitative potential of a criminal offender in sentencing does not require a court in every instance to grant the offender an opportunity for rehabilitation." (Internal quotation marks omitted.) *McGowan*, 2013 IL App (2d) 111083, ¶ 13. Thus, "[n]ot all criminal defendants must be given an opportunity for rehabilitation," and "the responsibility for balancing between rendering justice and rehabilitating the defendant rests with the trial court." (Internal quotation marks omitted.) *Id.*

¶ 76    The trial court set forth its reasoning and observations for imposing the lengthy sentence on the defendant, concluding, "You are a killer," and noting, belying defendant's argument of having a nonviolent criminal history, "Your criminal history is armed robbery, retail theft, mob action, aggravated unlawful use of a weapon. You have been involved with guns your adult life and you have used them criminally your entire adult life and I believe you are a danger *** to the public *** you are dangerous."

¶ 77    For the foregoing reasons, we cannot say the trial court abused its discretion in sentencing the defendant to an aggregate 80 years in the Illinois Department of Corrections. The court had the

26

responsibility of balancing between justice and rehabilitating the defendant. It took into account and weighed the factors before it. We will not disturb the trial court's decision.

¶ 78                                    E. One-Act, One-Crime Rule

¶ 79    The defendant lastly argues that he was sentenced to both count I and count II, both being first degree murder charges with the second being a lesser serious offense. He asks this court to vacate count II pursuant to Illinois Supreme Court Rule 615 (eff. Jan. 1, 1967).

¶ 80    The State agrees the judgment sheet of May 29, 2019, does not reflect the dismissal of count II and should be amended to vacate the defendant's conviction on count II.

¶ 81    We agree with both the defendant and the State and vacate the defendant's murder conviction on count II. We remand for an amendment to the judgment sheet to reflect the vacation of count II.

¶ 82                                    III. CONCLUSION

¶ 83    For the foregoing reasons, we affirm the circuit court of Madison County in subsections A through D above and vacate the second count conviction of first degree murder and remand the case under section E for correction of the judgment sheet.

¶ 84    Affirmed in part and vacated in part.